**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No.:08-CV-00391-JLK-KMT

THE NEW SALIDA DITCH COMPANY, INC., a Colorado Corporation

     **Plaintiff(s)**

v.

UNITED FIRE & CASUALTY INSURANCE COMPANY, an Iowa Corporation

     **Defendant(s)**

---

**DEFENDANT UNITED FIRE & CASUALTY COMPANY'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Defendant, United Fire & Casualty Company ("UFC"), by and through its undersigned counsel, The Hustead Law Firm, A Professional Corporation, submits its Brief in Support of Motion for Summary Judgment as follows:

## I.     <u>INTRODUCTION</u>

This action arises out of The New Salida Ditch Company's ("New Salida") contention that UFC improperly denied its duty to defend and indemnify New Salida under a liability policy against governmental actions ordering it to remedy its discharge of pollutants into the Arkansas River. UFC denied the claim as excluded from coverage under the policy's Total Pollution Endorsement because Colorado and federal law include the materials the Plaintiff deposited into the river in the definition of pollutant. Despite the applicable law interpreting the term "pollutant," the Plaintiff denies the pollution exclusion applies, asserting claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Unfair Claim - Deceptive Trade Practices Act and the Colorado Consumer Protection Act against UFC.

UFC is entitled to summary judgment on all of Plaintiff's claims because the material New Salida deposited on the banks of the Arkansas River constitute pollutants under Colorado statutory law and within the plain meaning of the policy. As such, the pollution exclusion defeats Plaintiff's breach of contract claim. Further, because there is no coverage, Plaintiff's bad faith claim fails, as do the Plaintiff's claims for violations of the Unfair Trade Practices and Consumer Protection Acts. Thus, UFC is entitled to summary judgment on all claims.

## II.  CERTIFICATION

The undersigned certifies that she did not confer with counsel for the Plaintiff prior to filing this Motion, as it is a Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56. *See* D.C.Colo.LCivR. 7.1(A).

## III.  STATEMENT OF FACTS

Plaintiff claims that it is entitled to defense and indemnification from UFC pursuant to its general liability policy for the Plaintiff's disposal of contaminants. (The Policy is attached as **Exhibit A**). Specifically, in 2005, the Plaintiff performed "repairs" on its irrigation ditch along the Arkansas River in Chaffee County, Colorado. In doing so, it added fill materials along the riverbank, some of which were placed below the high water line. Accordingly, several environmental agencies issued orders, notices of violations, and correspondence to the Plaintiff, advising that the soil and rock or fill material placed by the Plaintiff constituted "pollutants" within the meaning of Colorado statute.

For example, in an Order from the Colorado Department of Public Health and Environment (the "CDPHE"), the CDPHE alleged that the Plaintiff's activity disturbed land along the Arkansas River (the "River"), leaving it in an unstabilized condition with no pollution controls in place to prevent erosion or further release of sediment into the River. *See* **Exhibit B**

at Bates No. UFC 0041, ¶ 7.  The CDPHE Order also warned that the fill material posed threat to the beneficial uses of the River.   **Exhibit B** at Bates No. UFC 0041, ¶ 7.  Consequently, the CDPHE, along with other governmental entities, ultimately ordered the Plaintiff to remedy the problem.  *See generally* **Exhibit B** at Bates No. UFC 0042.

The Plaintiff tendered the CDPHE order to UFC for defense and indemnification, seeking coverage under a Commercial General Liability insurance policy with a policy number of 20111703 and policy period of April 4, 2005 to April 4, 2006 (the "Policy") (**Exhibit A**).   UFC denied any obligation to defend or indemnify the Plaintiff against the claims made by the CDPHE, finding the claims to be excluded from coverage under the total pollution exclusion. UFC also consulted with coverage counsel in response to Plaintiff's persistence that such exclusion did not apply.  Coverage counsel, however, reached the same conclusion.

Plaintiff's claims lack merit because not only does the Colorado statute under which the governmental agencies issued violations to the Plaintiff define fill material as a pollutant (*see* C.R.S. § 25-8-103(15)), but also because the policy includes irritants and contaminants in its definition of "pollutant."  Thus, the total pollution exclusion bars coverage here and Defendant UFC is entitled to judgment as a matter of law as to all of the Plaintiff's claims.

### IV.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On February 25, 2008, New Salida filed its Complaint against UFC seeking damages for breach of contract, bad faith, violation of the Colorado Unfair Claims-Deceptive Practices Act, and the Colorado Consumer Protection Act.  *See generally* Complaint [Doc. 1].

2.      On April 15, 2008, UFC filed its Answer and Jury Demand to New Salida's Complaint.  *See* Answer [Doc. 8].[1]

---

[1]New Salida has since filed an Amended Complaint [Doc. 16; filed August 21, 2008].  In lieu of filing an Answer, UFC filed a partial Motion to Dismiss [Doc. 17; filed Aug. 29, 2008], which remains pending before this Court.

3.　　　On or about April 4, 2000, UFC issued a CGL policy of insurance to New Salida as the named insured, with a policy number of 20111703, and a policy period of April 4, 2000 to April 4, 2001.  *See* Complaint [Doc. 1] at 2, ¶ 8; Answer [Doc. 8] at p. 2, ¶ 5; *see also* Certified Copy of April 4, 2000 policy (**Exhibit A**).

4.　　　In or about April 2005, New Salida, through construction or maintenance activity conducted and initiated on its behalf, disturbed "fill material" such that the material was placed into the waters of the Arkansas River.  *See* Complaint [Doc. 1] at p. 4, ¶ 11; **Exhibit B** at Bates No. UFC 0041, ¶ 7.

5.　　　In its Cease and Desist Order, the CDPHE explained that the riverbank remained "unstabilized with no pollution controls. . . .  If not remediated, the disturbed soil and rock ('fill material') at the Project pose imminent and substantial endangerment to the beneficial uses of the Arkansas River."  **Exhibit B** at Bates No. UFC 0041, ¶ 7; *See also* Complaint at p. 4, ¶ 11.

6.　　　As a result of the government's response to New Salida's disposal of soil and rock into the Arkansas River, New Salida tendered defense and indemnification of the CDPHE proceedings to UFC.  *See generally* correspondence dated March 13, 2006 (**Exhibit C**).

7.　　　UFC investigated New Salida's claim for defense and indemnification.  *See* Affidavit of Bill Newman at ¶ 2 (**Exhibit D**).

8.　　　The insurance issued to New Salida in April 2000 contained a Total Pollution Exclusion Endorsement, Form CG2149 (09-99) ("TPE") (*see* **Exhibit A** at Bates No. UFC 2678) which forms the basis of UFC's denial. *See* Correspondence dated March 29, 2006, at p. 7 (last paragraph of page) (**Exhibit E**).

9.　　　The TPE Endorsement provides:

---

Accordingly, the original Complaint is procedurally the only Complaint at issue. For the reasons stated in UFC's Motion to Dismiss [Doc. 17], Plaintiff's additional claims asserted in its Amended Complaint must be dismissed.

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVARAGE PART**
Exclusion f. under Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury and Property Damage Liability is replaced by the following:

This insurance does not apply to:

**f. Pollution**

    **(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

    **(2)** Any loss, cost or expense arising out of any:

        **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

        **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

**Exhibit A** at Bates No. UFC 2678.

10.    The Policy also defines "pollutants," as: ". . . any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed."  *See* **Exhibit A** at Bates No. UFC 2672, ¶ (15).

11.    New Salida renewed its CGL insurance annually through at least April 4, 2006. *See* Policy Certifications and Declarations Pages for Policy 20111703 at Bates Nos. UFC 2450 (2005-2006), UFC 2495 (2004-2005), UFC 2540 (2003-2004), UFC 2583 (2002-2003), and UFC

2628 (2001-2002) (collectively **Exhibit F**).[2]

12.     The language of the Total Pollution Exclusion ("TPE") has not changed since the date of the April 4, 2000, policy.  *See* **Exhibit A** at Bates No. UFC 2678 and **Exhibit F** at Bates Nos. UFC 2450 (2005-2006), UFC 2495 (2004-2005), UFC 2540 (2003-2004), UFC 2583 (2002-2003), and UFC 2628 (2001-2002) (noting the same form number for the TPE form in all declarations pages and on the original endorsement).  *See also* **Exhibit D** at ¶ 6.

13.     The definition of a "pollutant" has not changed since the date of the April 4, 2000, policy.  *See* **Exhibit A** at Bates No. UFC 2672; **Exhibit F** at Bates Nos. UFC 2672 and 2642 (form CG 0001 (07-98), used for policies in effect from 2000 to 2002); 2600, 2559 and 251 (form CG 0001 (10-01) used for policies in effect from 2002 to 2005); and 2465 (form CG 0001 (12-04) used for the policy in effect from 2005 to 2006).  *See also* **Exhibit D** at ¶ 7.

14.     If the language of the TPE had changed at any point from 2000 to 2006, the form number for the TPE would have changed to reflect the modification of the endorsement language.  **Exhibit D** at ¶ 8.

15.     As a result of the CDPHE's Cease and Desist Order, New Salida was required to develop and implement a Remediation Plan to clean up and remove at least a portion of the soil, rock and fill material it deposited into the Arkansas River.  *See generally* Remediation Plan, dated March 27, 2006 (**Exhibit G**); amended by various letters (**Exhibits G-1, G-2, G-3, G-4**).

16.     New Salida incurred costs and expenses, in the form of attorneys' fees and expert consulting costs, during the process of developing the Remediation Plan, and defending the

---

[2]In an effort to avoid needless production of identical documents, UFC only attaches the policy certifications, the declarations pages, and the pages of each CGL form for each policy period which contains the definition of "pollutants."  The certifications state that the policies are certified copies of the policies sent to the insured.  The declarations pages identify all policy forms attached to the policy, one of which is the TPE.  At the Court's request, UFC will produce full copies of each policy from 2001 to 2006.

CDPHE's enforcement action.  *See* New Salida's Responses to Written Discovery at 3-4 (**Exhibit H**), and incorporating New Salida's Initial Disclosures at 6-7 (**Exhibit I**).

17.    UFC denied New Salida's request for defense and indemnification because the TPE defeats coverage for the loss claimed by New Salida.  *See* **Exhibit E** at Bates No. UFC 353; Correspondence dated June 8, 2006 (**Exhibit J**).  *See also* **Exhibit D** at ¶¶ 3 and 5.

18.    UFC considered New Salida's additional arguments and facts, and still found no coverage, even after consulting counsel.  *See* correspondence dated July 28, 2006 (**Exhibit K**); correspondence dated August 25, 2006 (**Exhibit L**); **Exhibit D** at ¶¶ 3-5.

19.    More recently, New Salida entered into a Compliance Order with the CDPHE, imposing a civil penalty on New Salida, and requiring it to complete a Supplemental Environmental Project in order to achieve settlement with the CDPHE.  *See generally* Compliance Order on Consent, dated May 28, 2008 at p. 3 (**Exhibit M**).

## V.    STANDARD OF REVIEW

### A.    Standards Applicable to a Motion for Summary Judgment.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  In applying this standard, the court must examine the factual record and draw all reasonable inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2003), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "An issue of fact is 'material' if

under the substantive law it is essential to the proper disposition of the claim." *Id.*   The moving party bears the initial burden of demonstrating that there is an absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   Summary judgment should not, however, be viewed as a disfavored procedural shortcut, but rather as a procedure designed to secure the just, speedy and inexpensive determination of every action. *Id.* 477 U.S. at 327.

Where, as here, the Court sits in diversity jurisdiction, the *Erie* doctrine mandates that the court apply state substantive law and federal procedural law.  *Blackhawk-Central City Sanitation Dist. v. American Guar. and Liab. Ins. Co.*, 214 F.3d 1183, 1188 (10th Cir. 2000); *Sofford v. Schindler Elevator Corp.*, 954 F.Supp. 1459, 1460 (D.Colo.1997).  As will be explained below, there are no genuine issues of material fact under Colorado's substantive law such that UFC is entitled to summary judgment on all of the Plaintiff's claims.

**B.     Principles of Insurance Contract Interpretation.**

As insurance policies are contracts, they must be interpreted according to general principles of contract analysis.  *See Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999).  The interpretation of an insurance contract is a matter of law.  *Id.; TerraMatrix, Inc. v. U.S. Fire Ins. Co.*, 939 P.2d 483, 486 (Colo. App. 1997).  Words in an insurance contract are to be accorded their plain and ordinary meaning unless the parties' intent, expressed in the contract, indicates otherwise.  *See Compass*, 984 P.2d at 613.  A court is to enforce a policy as written, unless there is an ambiguity in the policy.  *See Terramatrix*, 939 P.2d at 486.

Courts may not, therefore, look beyond the plain words of the insurance contract to interpret it based on the parties' underlying intent, unless the contract terms are ambiguous or are used in a special or technical sense not defined in the contract.  *Id.*; *Compass*, 984 P.2d at 613.

That is, courts attempt to avoid strained or technical interpretations, while at the same time reading the policy as would a person of ordinary intelligence, giving effect to the meaning of the policy as a whole. *See Progressive Specialty Ins. Co. v. Hartford Underwriters, Co.*, 148 P.3d 470, 474-75 (Colo. App. 2006).

A contractual provision is ambiguous, and therefore should be construed in favor of the insured, when the provision is reasonably susceptible to different meanings. *Compass*, 984 P.2d at 613. The mere fact, however, that two parties disagree about the meaning of a contractual provision is insufficient to establish ambiguity. *Terramatrix*, 939 P.2d at 486 (citing *Kane v. Royal Ins. Co.*, 768 P.2d 678 (Colo. 1989)).

**C.      Principles Governing an Insurer's Duty to Defend.**

The duty to defend is broader than, and is separate from, the duty to indemnify. *Compass*, 984 P.2d at 613. An insurer seeking to avoid a duty to defend bears a heavy burden. *Id.* (quoting *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991)). The high burden extends to arguments that a policy exclusion defeats coverage. *Id.* at 614. In such an example, the exclusion must apply and not be subject to any other reasonable interpretation. *Hecla*, 811 P.2d at 1090.

In determining whether there is a duty to defend, courts look solely at the allegations contained in the complaint, or claim, filed in the underlying action. *Terramatrix*, 939 P.2d at 486. This rule is referred to as the "Complaint Rule," and Colorado courts have reiterated its applicability on more than one occasion. *See Hecla*, 811 P.2d at 1089; *Compass*, 984 P.2d at 615. Under the Complaint Rule, courts are not allowed to consider extrinsic facts. *Id.*

## VI.    ARGUMENT

**A.    The Plain Meaning of the TPE Defeats Coverage for the Claims against New Salida**.

UFC investigated New Salida's demand for defense and indemnification of the claim asserted by the CDPHE in its Cease and Desist Order, ultimately hiring counsel to assist in its coverage analysis.  UFC and its coverage counsel determined that it had no duty to defend the claims asserted against New Salida as a result of its placement of fill material into the Arkansas River because the policy's TPE and accompanying definitions defeated coverage for the claim. Colorado's statutory definitions of "pollutant" and "pollution", as well as case law from Colorado and other jurisdictions construing similar exclusions support this conclusion.

As set forth above, the TPE endorsement replaces paragraph (2)(f) in Section I of the policy.  *See* Exhibit A at Bates UFC 2678.  Specifically, the endorsement provides that the insurance does not apply to:

> **(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened *discharge*, dispersal, seepage, *migration, release* or escape of "pollutants" at any time.
>
> **(2)** Any loss, cost or expense arising out of any:
>
> **(a)** Request, demand, order or **_statutory_** or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or
>
> **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

Exhibit A at Bates No. UFC 2678 (emphasis added).

1.    **The TPE Applies to the Property Damage Caused by New Salida's Discharge of Pollutants.**

The policy defines "pollutant," as "<u>any solid</u>, liquid, gaseous or thermal irritant or *contaminant*, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed." *See id.* at UFC 2672, ¶ (15) (emphasis added). While solid is not defined in the policy, it is a word with an ordinary meaning. Solid is commonly defined as "not hollow, . . . not loose or spongy: compact (a mass of rock); also: neither gaseous nor liquid." Merriam-Webster Dictionary at 692 (1997); *see also* The Oxford American Desk Dictionary and Thesaurus at 795 (2nd ed. 2001) ("firm and stable in shape; not liquid or fluid"). Also undefined is "contaminant." This term and "contaminate" are commonly defined as "to soil, stain, corrupt, or infect by contact or association; to make inferior or impure by admixture; to make unfit for use by the introduction of unwholesome or undesireable elements." Merriam-Webster's Collegiate Dictionary, 249 (10th ed. 1996).

Giving these ordinary words their plain meaning, New Salida's act of moving the solid fill material such that it was released into the Arkansas River falls within the scope of the TPE which precludes coverage for any property damage occurring as a result of "any actual or alleged dispersal, seepage, migration, release or escape of pollutants at any time." Exhibit A at UFC 2678. There is no issue of material fact that the activities New Salida conducted in April 2005 resulted in the movement of soil, rock, and sand. *See* Complaint [Doc. 1] at 4, ¶ 11; **Exhibit B** at 2. It is likewise undisputed that the fill material that New Salida disturbed was "introduced" into the Arkansas River. *See* **Exhibit B** at 2; Complaint [Doc. 1] at 4, ¶ 11.[3] Furthermore, there is no dispute that the fill material—i.e., soil, rock, and sand—that New Salida moved, was or is, a

---

[3]Whether New Salida placed the fill material into the Arkansas River purposefully or accidentally is irrelevant for purposes of summary judgment because the TPE is not limited to intentional acts; it applies regardless of whether the contamination was intended or not. *See* Exhibit A at Bates No. UFC 2678.

solid and a contaminate to the river.  As set forth below, introducing this material into the Arkansas River amounts to engaging in an act of pollution according to state law.

Courts are to enforce unambiguous insurance policies as they are written, striving to avoid strained interpretations.  *Progressive Specialty*, 148 P.3d at 474-75.  The definition of pollutant is unambiguous.  The plain and ordinary meaning of solid is unambiguous.  The TPE's application to the dispersal of any pollutant is unambiguous.  Thus, the TPE should be enforced as written (*see Terramatrix*, 939 P.2d at 486) and summary judgment in UFC's favor is appropriate because the TPE defeats coverage here.

     **2.**     **The Expenses New Salida Incurred Because of the CDPHE's Notice of Violation Are Also Excluded by the TPE.**

The claims for which Plaintiff seeks coverage fall squarely within the TPE's exclusion of the costs to respond to a statutory requirement regarding the effects of pollutants.  The TPE plainly and unequivocally excludes from coverage, any costs or expense arising out of any:

> **(a)** Request, demand, **_order or statutory or regulatory requirement_** that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

> **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

**Exhibit A** at Bates UFC 2678 (emphasis added).  Like the term "solid", the phrase "Claim or suit by or on behalf of a governmental authority" is also not defined by the policy.  Despite this lack of definition, Colorado courts have explained that coercive actions brought by a governmental agency to enforce environmental laws qualify as a claim or a suit for purposes of a CGL policy.  *See Compass*, 984 P.2d at 622.  Further, the order plainly amounts to a statutory requirement within the meaning of the TPE.  Accordingly, there should be no dispute that the

expenses New Salida incurred in responding to the CDPHE's Notice of Violation qualify as a claim for damages *as a result of the effects of pollutants*; thus, they are excluded from coverage.

Here, several facts support this conclusion. On March 6, 2006, the CDPHE issued its Notice of Violation to New Salida. *See generally* **Exhibit B**. The CDPHE alleged New Salida had violated state water quality laws. *Id.* at Bates No. UFC 0041, paragraphs under "Notice of Violation". Furthermore, the CDPHE ordered New Salida to retain someone to evaluate the disturbed area and develop a plan to remediate, remove and/or clean up the fill material placed into the Arkansas River. *See* **Exhibit B** at Bates No. UFC 0042 ¶¶ 13-14. Ultimately, New Salida agreed to implement a Remediation Plan to clean up the area in which the fill material was placed. *See generally* **Exhibits G, G1-G4, M**. Likewise, New Salida consented to the imposition of a civil penalty and requirement that it also implement a Supplemental Environmental Project in order to avoid litigation. *See* **Exhibit M** at p. 3 of 9, ¶ 19 & 20. As a result, it is wholly undisputed that New Salida incurred costs and expenses to defend against the CDPHE's actions and orders that New Salida remedy its polluting activity.

Courts are to enforce unambiguous insurance policies as they are written, striving to avoid strained interpretations. *Progressive Specialty*, 148 P.3d at 474-75. The TPE's language excluding fees and costs incurred as a result of any request, demand, order or statutory or regulatory requirement that New Salida test, clean, or remove a pollutant is unambiguous. The TPE is also unambiguous in its prohibition on any claim or suit by a governmental authority for damages. *See Compass*, 984 P.2d at 622-23. Thus, the TPE should be enforced as written, *Terramatrix*, 939 P.2d at 486, and summary judgment in UFC's favor is appropriate because the TPE defeats any coverage afforded by New Salida's policy.

**B.**   **Colorado Statutory Law Demonstrates that the Total Pollution Exclusion Defeats Coverage.**

The Colorado statutes which govern water quality control in the context of environmental enforcement also support the conclusion that the TPE precludes coverage of New Salida's activities. Specifically, a "pollutant" is defined as, among other things, "dirt, . . .rock, [and] sand." C.R.S. § 25-8-103(15) (2008). "Pollution" is similarly defined as "the man-made, man-induced, or natural alteration of the physical. . . integrity of water." C.R.S. § 25-8-103(16) (2008) (emphasis added).

The fill material that New Salida moved was undisputedly dirt, rock and sand. Ralph Scanga, as New Salida's Rule 30(b)(6) representative, admitted that the fill material was dirt, rock, and sand. *See* Deposition transcript at p. 54, ll. 8-12, (**Exhibit N**). The CDPHE specifically alleged the material New Salida deposited in the Arkansas River was dirt and rock and constituted a pollutant. *See* **Exhibit B** at Bates No. UFC 0041, ¶ 9; **Exhibit M** at ¶¶ 9-11. This fill material undisputedly made its way into the Arkansas River as a result of man induced actions of New Salida. **Exhibit N** at p. 74 ll. 16-19. Section 25-8-103(16) includes man-induced alteration of the physical integrity of water within its definition of pollution. Therefore, examining these statutory provisions in conjunction with the plain language of the policy, it is clear that the TPE excludes the activities New Salida conducted in April 2005 from coverage.

**C.**   **Colorado Case Law Establishes that the Total Pollution Exclusion Defeats Coverage.**

There are only two reported cases in Colorado interpreting a Total (or Absolute) Pollution Exclusion similar to the exclusion included in New Salida's policy. *See Cotter Corp. v. American Empire Surplus Lines Ins. Co.*, 64 P.3d 886 (Colo. App. 2002), *rev'd on other*

*grounds*, 90 P.3d 814 (Colo. 2004);[4] *Terramatrix, Inc. v. United States Fire Ins. Co*., 939 P.2d

483 (Colo. App. 1997).  As related to their holdings on the absolute pollution exclusion, both

*Cotter* and *Terramatrix* remain good law.

The court in *Terramatrix* examined an absolute pollution exclusion as a result of injuries

alleged to have been caused by the insured's release of ammonia gases into the office space of a

tenant.  939 P.2d at 485.  The language of the exclusion at issue in *Terramatrix* was substantially

similar to the language of the TPE here.  *Compare Id.* at 487, *with* Exhibit A at Bates No. UFC

2678.  The court found it important that the pollution exclusion clause at issue:

> is an *<u>absolute</u>* pollution exclusion clause and differs significantly
> from the pollution exclusion clause contained in earlier versions of
> the CGL contract.  Earlier versions of the contract clause contained
> an exception for "*<u>sudden and accidental</u>*" releases of pollutants.
> *See Hecla Mining Co. v. New Hampshire Ins. Co., supra*
> (construing earlier version; *Englewood v. Commercial Union
> Assurance Co., supra* (same).   However, the absolute pollution
> **<u>exclusion contains no such exception</u>**.

*Terramatrix*, 939 P.2d at 487 (emphasis added).  That change in language is pertinent here.

The TPE in New Salida's policy excludes any property damage arising out of the actual,

alleged, or threatened discharge of pollutants.  *See* Exhibit A Bates No. UFC 2678.  There is no

exception that restores coverage because New Salida *accidentally* discharged rock into the

Arkansas River, as used to be the industry norm.  *See* Nancer Ballard and Peter M. Manus,

*Clearing Muddy Waters:  Anatomy of the Comprehensive General Liability Pollution Exclusion*,

75 Cornell L.Rev. 610 (1990) (describing how, in 1985 insurers began removing the qualified

exception from pollution clauses, and modifying the exclusion to an absolute exclusion).

*Terramatrix*, however, recognized a split of authority over whether a total pollution

---

[4]While *Cotter* examined policies with both an absolute pollution exclusion and a qualified pollution exclusion, the Colorado Supreme Court did not review the court of appeals' holdings on the absolute pollution exclusion.  *See Cotter*, 90 P.3d at 819 n. 1 (identifying issues granted on certiorari).

exclusion clause is always unambiguous, or whether the clause is unambiguous when applied to a particular set of facts and circumstances. *Terramatrix*, 939 P.2d at 487. The court adopted the latter approach, reasoning that it is in keeping with the approach generally taken by Colorado courts in interpreting insurance policies. *Id.* Applying the facts and circumstances presented, the *Terramatrix* court concluded that the pollution exclusion was unambiguous when applied to the ammonia vapors. That is, ammonia constituted a pollutant and the release of the ammonia gases was a "discharge, dispersal, . . . release, or escape" within the meaning of the pollution exclusion. *Id.* at 488 (citing *Cook v. Evanson*, 920 P.2d 1223 (Wash. 1996) (finding pollution exclusion not limited to classic environmental pollution)).

Specifically, the court noted that in addition to being a regulated substance under several federal programs, ammonia is also a component of air pollution *under Colorado law*. *Id.* Furthermore, other jurisdictions had concluded that ammonia was a pollutant when construing CGL policy language similar to that contained in the *Terramatrix* policy. Accordingly, the court refused to adopt the position that the absolute pollution exclusion is limited solely to environmental or industrial contexts. *Id.*

The court in *Cotter* also examined exclusionary language nearly identical to New Salida's TPE policy language. *Compare* 64 P.3d at 893, *with* Exhibit A Bates No. UFC 2678. Like the *Terramatrix* court, the *Cotter* court applied the facts and circumstances to determine whether the exclusion was ambiguous. *Cotter*, 64 P.3d at 893. Cotter was a uranium mill operator who sought a declaratory judgment that the pollution exclusions in its policies covered the injuries sustained by pollution from its uranium mill. *Id.* at 887. Some of Cotter's policies contained a qualified pollution exclusion, and others an absolute pollution exclusion. *Id.* at 887-88. The trial court concluded that the absolute exclusion was clear, unambiguous, and enforceable. *Id.* at 892-

16

93. Specifically, the trial court stated that "the exclusion clause is clearly intended to be an absolute bar to coverage for any form of pollution." *Id.* at 893.

Affirming the trial court, the court of appeals rejected Cotter's argument that the clause was ambiguous, relying on the logic and rationale of *Terramatrix*. *Id.* Specifically, the court noted that Cotter and its insurer "could have negotiated a policy that more precisely identified materials produced by Cotter that [the insurer] intended to exclude from coverage; [however,] they did not do so." *Id.* Furthermore, while the court recognized that a literal interpretation of the total pollution exclusion could lead to a negation of coverage, it agreed with the "overwhelming majority of courts" that the exclusion unambiguously bars coverage for claims arising out of exposure to irritants, pollutants, or contaminants. *Id.* at 893.

Here, the holdings of *Terramatrix* and *Cotter* are directly on point with the TPE in New Salida's policy. A cursory examination reveals that the exclusionary language in all three policies is substantially similar. *See* Exhibit A Bates No. UFC 2678; *Terramatrix*, 939 P.2d at 487; *Cotter*, 64 P.3d at 893. In both *Terramatrix* and *Cotter*, the court determined that the facts and circumstances of each case required a finding that the pollution exclusion was unambiguous as applied there. A review of the facts and circumstances applicable to New Salida mandates the same finding, thereby resulting in an entry of summary judgment in UFC's favor.

Indeed, looking to the underlying complaint here, which is the CDPHE's Notice of Violation, New Salida is alleged to have displaced fill material into the Arkansas River. *See* **Exhibit B** at Bates No. UFC 0041, ¶ 7. This fill material is rock and sand. *Id.* Rock and sand are specifically defined by Colorado statute as a pollutant. *See* C.R.S. § 25-8-103(15) (2008). "Pollution" is similarly defined as "the man-made, man-induced, or natural alteration of the physical. . . integrity of water." C.R.S. § 25-8-103(16) (2008). Furthermore, rock and sand are

17

also components of the Federal Clean Water Act.  *See* 33 U.S.C. § 1362(6) (defining pollutant to include rock and sand discharged into water).  Thus, just as *Terramatrix* concluded that ammonia was a pollutant within the meaning of the TPE because it was defined as such under federal and Colorado law, so too rock and sand must be found to be pollutants here within the meaning of New Salida's TPE because they are defined as pollutants under both federal and Colorado law. *See Terramatrix*, 939 P.2d at 488; *also Sierra Club Mineral Policy Center v. El Paso Gold Mines, Inc.*, No. Civ. A.01 PC 2163 OES, 2002 WL 33932715 at *7 n.3 (D. Colo. 2002) (unpublished) (attached as **Exhibit O**); *Driscol v. Adams*, 181 F.3d 1285, 1291 (11th Cir. 1999) (sand, silt, and rainwater runoff are pollutants under the Clean Water Act); *Hugley v. JMS Dev. Corp*, 78 F.3d 1523, 1525 n.1 (11th Cir. 1996).

## D.    Other Jurisdictions Support Application of the Total Pollution Exclusion to New Salida's Activities.

As part of their analysis, the *Terramatrix* and *Cotter* courts also recognized the vast number of decisions that have applied the total pollution exclusion.  *Cotter*, 64 P.3d at 893-94; *Terramatrix,* 939 P.2d at 488.  This District has also examined an absolute pollution exclusion, concluding that it bars coverage for the discharge of kitchen grease and other by-products.  *See Mountain State Mut. Cas. Co. v. Kirkpatrick*, No. 06-cv-00221-WDN-OES, 2007 WL 2506640 (D. Colo. 2007) (attached as **Exhibit P**).

No Colorado court, state or federal, has considered whether the specific issue of rock and sand deposited into a body of water constitutes a pollutant within the meaning of a pollution exclusion.  The jurisdictions who have examined this issue have concluded that dirt, rock, sand, silt, sediment, and other natural particles constitute a pollutant within the meaning of a total pollution exclusion.  *See Essex Ins. Co. v. H&H Land Development Corp*, 525 F.Supp.2d 1344, 1352-53 (M.D. Ga. 2007) (finding silt and sediment from construction fell within exclusion);

18

*Owners Ins. Co. v. Chadd's Lake Homeowners Assoc., Inc.*, 2006 WL 1553888 (N.D. Ga. 2006 (unpublished decision) (same) (attached as **Exhibit Q**) (citing *Owners Ins. Co. v. Lake Hills Home Owners*, 57 Fed. Appx. 415, No. 02-14556 (11th Cir. 2002) (unpublished)); *Monarch Greenback, LLC v. Monticello Ins. Co.*, 118 F.Supp.2d 1068, 1079-80 (D. Idaho 1999) (concluding sand, silt, clay, arsenic, mercury, and zinc deposits from mining operations were within exclusion); *Clarendon America Ins. Co. v. Bay, Inc.*, 10 F.Supp.2d 736, 743-44 (S.D. Tex. 1998) (explaining sand, gravel, cement, and silica are pollutants within exclusion); *Pennsylvania National Mut. Cas. Ins. Co. v. Triangle Paving, Inc.*, 973 F.Supp. 560, 563-65 (E.D. N.Car. 1996) (finding sediment from construction was a pollutant within exclusion); *Ortega Rock Quarry v. Golden Eagle Ins. Corp.*, 141 Cal.App.4th 969, 981 46 Cal.Rptr3d 517, 525 (2006) (finding natural dirt and rocks are pollutants within the meaning of the Clean Water Act; thus, their discharge barred by the pollution exclusion).

The common thread in reasoning from these other jurisdictions is that the particles discharged or dispersed are also defined as pollutants by state and/or federal water pollution laws. *See Owners,* **Exhibit Q** at p. 6-7; *Triangle Paving*, 973 F.Supp. at 563-65 (explaining how state statutory structure provides context to common terms); *Ortega Rock Quarry*, 141 Ca.App.4th at 969.

*Ortega* is particularly instructive. In that case, the insured quarry operator sought defense and indemnity against a clean up order imposed by the EPA arising out of the insured's discharge of fill material into a creek in violation of the Federal Clean Water Act. Like the Colorado statute involved in the instant matter, the Clean Water Act defines pollutants as "dredged soil, solid waste, . . . rock, sand, cellar dirt and . . . agricultural discharged into water." 33 U.S.C.A. § 1362(6) (cited in *Ortega Rock*, 151 Cal App.4th at 980).

Thus, while acknowledging that the policy's definition of pollution did not specifically incorporate the Clean Water Act's definition, the court explained that state and federal environmental laws may provide insight into the scope of the policy definition of pollution. *Id.* The court determined, therefore, that even though dirt and rocks are "naturally" existing substances, because the Clean Water Act defines them as pollutants when placed in water, the carrier had no duty to defend as a result of the absolute pollution exclusion. *Id.* at 981.

Similarly here, it is undisputed that rock and sand are defined by Colorado statutes as pollutants and the act of polluting includes the man-induced alteration of the physical integrity of a water. *See* C.R.S. § 25-8-103(15), (16). New Salida's actions of moving fill material fall squarely within this statutory definition, which in turn falls squarely within the language of the Total Pollution Exclusion. Thus, there is no genuine issue of material fact as to whether the Total Pollution Exclusion applies to defeat coverage, removing any duty to defend New Salida in the underlying action brought by the State of Colorado. Accordingly, summary judgment in UFC's favor is appropriate on New Salida's First Claim for Relief for Breach of Contract.

**E.      Absent any Cognizable Coverage, New Salida's Statutory and Common Law Bad Faith Claims Fail.**

The tort of breach of the duty of good faith and fair dealing in the insurance context is based on the parties' contractual duties. *Farmers Group, Inc., v. Trimble*, 691 P.2d 1138, 1142 (Colo. 1984); *Lira v. Shelter Ins. Co.*, 913 P.2d 514, 516 (Colo. 1996). As a result, it is well-settled in Colorado that an insurer "cannot be held liable for damages for breach of a duty which it did not have in the first place." *Lira*, 913 P.2d at 517. In other words, where no coverage exists for a specific claim, there can be no bad faith as a matter of law. *See Miller v. Hartford Cas. Ins. Co.*, 160 P.3d 408, 412 (Colo. App. 2007) (explaining that where duty to defend and indemnify is resolved in insurer's favor, bad faith is subject to summary judgment); *Farmer's*

*Alliance Mut. Ins. Co. v. Cutrone*, 448 F.Supp.2d 1226, 1234 (D. Colo. 2006) (same); *Tynan's Nissan, Inc., v. American Hardware Mut. Ins. Co.*, 917 P.2d 321, 325-26 (Colo. App. 1995).

Here, because the Total Pollution Exclusion operates to defeat New Salida's tender of defense and indemnification, there is, in fact, no coverage for New Salida's claim. If there is no coverage for the claim, UFC cannot have acted in bad faith. Accordingly, summary judgment on New Salida's common law bad faith claim is appropriate.

New Salida's attempt to seek relief in its Amended Complaint under Colorado's new first-party bad faith statutes is equally untenable. *See* C.R.S. §§ 10-3-1115, 10-3-1116. As no duty to defend or indemnify arises under the policy, there is no coverage or consequent bad faith. *See Miller*, 160 P.3d at 412; *Cutrone*, 448 F.Supp.2d at 1234. Further, and fundamentally more importantly, Sections 1115 and 1116 explicitly apply only to first-party bad faith actions. This action, however, clearly falls within the third-party category. To be sure, the Colorado Supreme Court explained the distinction between first and third-party claims as follows:

> When the benefit derives from the insurer's duty to defend the insured against third-party actions, that relationship is characterized as a "third-party claim." A "first-party claim," on the other hand, results when the insured makes a claim against his insurer for benefits accruing directly from the insurance contract.

*Farmers Group, Inc. v. Williams*, 805 P.2d 419, 421 (Colo. 1991). As New Salida asserts UFC was obligated to defend and indemnify it against the CDPHE's enforcement action, its claim clearly fits within the above definition of a third party claim. Accordingly, whether grounded in common law or statute, New Salida's Second Claim for Relief for bad faith is subject to summary adjudication.[5]

---

[5]The Plaintiffs' amended claim under C.R.S. §§ 10-3-1115, 10-3-1116 are also not viable for the reasons set forth in UFC's Partial Motion to Dismiss.

**F.    New Salida's Claim for Violation of the Unfair Competition-Deceptive Practices Act Does Not State a Viable Claim for Relief.**

Not only does Plaintiff's claim for alleged violations of the Unfair Competition – Deceptive Practices Act (the "UCDPA") fail because there is no coverage for its claim, but also because the UCDPA does not create a private right of action.  *See American Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344 (Colo. 2004) (no private right of action under UCDPA).   Indeed, the *American Family v. Allen* court explained that the UCDPA "sets forth standards for <u>*when the commissioner of insurance*</u> may find that an insurance company is engaged in unfair or deceptive trade practices." *Id.* (Emphasis added).   In other words, the General Assembly "limited the power to issue sanctions under the [Unfair Competition Deceptive Practices] Act to the commissioner of insurance." *Id.* at n. 16 (citing *Schnacker v. State Farm Mut. Auto. Ins. Co.*, 843 P.2d 102, 104 (Colo. App. 1992) (*cert denied*)).

Under well-established Colorado law, therefore, the Plaintiff can state no claim under the UCDPA and UFC is entitled to summary judgment on New Salida's Third Claim for Relief for violations of C.R.S. § 10-3-1101, *et seq.*

**G.    New Salida's Claim under the Colorado Consumer Protection Act Fails.**

In order to state a private cause of action under Colorado's Consumer Protection Act, C.R.S. § 6-1-101 *et seq.* (the "CCPA"), New Salida must establish the following elements: (1) UFC engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of UFC's business; (3) the challenged practice significantly impacts the public as actual or potential consumers of UFC's goods or services; (4) New Salida suffered injury in fact to a legally protected interest; and (5) the injury was caused by the challenged practice. *See Anderson v. State Farm Mut. Auto. Ins. Co.*, 416 F.3d 1143, 1148 (10th Cir. 2005) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-147 (Colo. 2003)).

New Salida's CCPA claim fails because it has neither alleged that UFC engaged in a deceptive trade practice nor that UFC's practices have impacted the public.

      **1.**    <u>**New Salida Has Not Alleged Facts Showing UFC Violated a Specific Provision of the CCPA.**</u>

   As the CCPA was intended to protect against consumer fraud, allegations of deceptive trade practices must be pled with particularity. *See Duran v. Clover Club Foods Co.*, 616 F.Supp. 790, 793 (D. Colo. 1985). Indeed, this court has held that a plaintiff must also plead a specific violation of the CCPA in order for a claim to be cognizable under the Act. *Voth v. Liberty Mut. Fire Ins. Co.*, Slip Copy 2008 WL 435288, at *2 (D. Colo. 2008) (attached as **Exhibit R**). New Salida has not alleged that UFC violated any specific provision of the CCPA. Rather, the bases for New Salida's CCPA claim are that UFC allegedly improperly denied its duties to defend and indemnify New Salida against the CDPHE order. For this reason alone, the CCPA claim must be dismissed. *See id.*

   Further, the mere breach of an insurance policy, even in bad faith, does not implicate the CCPA. *See North River Ins. Co. v. Bishop of Pueblo*, Slip Copy, 2008 WL 280842, at *3 (D. Colo. 2008) (attached as **Exhibit S**). Instead, to support a CCPA claim, a plaintiff must assert, at a minimum, that the defendant committed a deceptive trade practice which causes the plaintiff damages. *Voth* at *2. And, to show a defendant has committed a deceptive trade practice, the plaintiff must allege that the defendant *knowingly* made a false representation. *Bonanno v. Quizno's Franchise Co. LLC*, Slip Copy, 2008 WL 638367 at *3 (D. Colo. 2008) (quoting *Rhino Linings*, 62 P.3d at 147) (attached as **Exhibit T**).

   In its CCPA claim, New Salida alleges that UFC determined that rock, soil and fill material amount to pollutants within the meaning of the TPE and thus improperly denied coverage. These allegations go to UFC's claim handling as opposed to whether UFC *knowingly*

23

engaged in a deceptive trade practice.  As such, they are insufficient to state a claim under the CCPA and Plaintiff's Third Claim for Relief must be dismissed.  *See Nauert v. ACE Property and Cas. Ins. Co.*, 2005 WL 2085544 at *5 (D. Colo. 2005) (citing *Coors Security Life of Denver Ins Co.*, 91 P.3d 393 (Colo. App. 2003) *aff'd in part and rev'd on other grounds*, 119 P.3d 59, 63-64 (Colo. 2005) (explaining actions which support a bad faith claim do not alone support a CCPA claim)) (attached as **Exhibit U**).

### 2.    Plaintiff's CCPA Claim Fails for Lack of Public Impact.

 The CCPA claim also fails because New Salida cannot establish public impact.  The CCPA is a remedial statute intended to deter and punish deceptive trade practices committed by businesses in dealing with the public.  *Showpiece Homes Corp. v. Assur. Co. of America,* 38 P.3d 47, 50-51 (Colo. 2001).  Thus, if the alleged deceptive trade practice occurs only within the context of a private agreement and does not impact the public, then the CCPA provides no remedy.  *Cavitat Medical Technologies, Inc. v. Aetna, Inc.*, 2006 WL 218018 at *3 (D. Colo. 2006).  (Attached as **Exhibit V**).  New Salida's CCPA allegations are based on conduct unique to the transaction between New Salida and UFC and thus do not give rise to a claim under the CCPA.  *See Bankruptcy Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 528-29 (Colo. App. 2008) (allegations based on conduct unique to a particular transaction is insufficient to state a claim under the CCPA).

As part of its CCPA claim, New Salida alleges that UFC's application of the TPE to the claims against New Salida and corresponding denial of coverage somehow unfairly burdens UFC's policyholders and members of the public as potential consumers of UFC's services. These allegations do not relate to UFC's handling of claims in general, but arise solely out of UFC's handling of New Salida's unique tender of defense of the proceedings herein.  UFC's

actions, therefore, constitute no more than a private dispute between New Salida and UFC and do not rise to the level of actions which affect consumers generally. *See North River Ins.* at *3. Consequently, Plaintiff's Third Claim for Relief for violation of the CCPA is not actionable and must be dismissed.

## VII.     CONCLUSION

For the foregoing reasons, UFC is entitled to summary judgment on all of the Plaintiff's claims. Plaintiff's breach of contract claim fails as a matter of law because the dirt, rock and fill material amount to contaminants when placed into a river, thus falling within the definition of pollutants within the plain meaning of the policy and Colorado and federal statutory law. Thus, the TPE bars coverage of the claims asserted against New Salida. Consequently, as there is no coverage, Plaintiff's claim for breach of the duty of good faith and fair dealing also fails. Likewise, Plaintiff's claims under the Unfair Claim-Deceptive Practices Act fails because no private right of action exists under such Act. Finally, Plaintiff cannot support its Consumer Protection Act claim because it has neither alleged a specific violation of the of the Act nor asserted a sufficient public impact. In short, therefore, there is no genuine issue of material fact as to any of Plaintiff's claims and UFC is entitled to judgment on all claims asserted against it.

WHEREFORE, United Fire Casualty & Company respectfully requests that the Court enter summary judgment in its favor, thereby dismissing Plaintiff's Amended Complaint and for such further relief as the Court deems proper.

Respectfully submitted this 6th day of April, 2009.

Respectfully submitted,

The Hustead Law Firm
*A Professional Corporation*

By:  /s/ Melissa Shisler
Patrick Q. Hustead, Esq.
Melissa W. Shisler, Esq.
Adam B. Kehrli, Esq.
4643 S. Ulster Street, Suite 1250
Denver, CO  80237
Telephone: (303) 721-5000

*Attorneys for United Fire & Casualty Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day April, 2009, I delivered a true and correct copy of the foregoing **DEFENDANT UNITED FIRE & CASUALTY COMPANY'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was sent electronically via CM/ECF to the following:

William J. Brady, Esq.
1700 Lincoln St., Suite 3800
Denver, CO 80219
wmjbrady@grimshawwharring.com

*Attorney for Plaintiff*

*Original Signature on File at The Hustead Law Firm*

 /s/ Gretchen Doyle
Gretchen Doyle

26