**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No.:08-CV-00391-JLK-KMT

THE NEW SALIDA DITCH COMPANY, INC., a Colorado Corporation

      **Plaintiff(s)**

v.

UNITED FIRE & CASUALTY INSURANCE COMPANY, an Iowa Corporation

      **Defendant(s)**

---

**CLARIFICATION AND CORRECTION OF PREVIOUSLY SUBMITTED EXHIBITS TO DOCKET NO. 73 - DEFENDANT UNITED FIRE & CASUALTY COMPANY'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY FOR BREACH OF CONTRACT AND BAD FAITH**

---

Defendant, United Fire & Casualty Company ("UFC"), by and through its undersigned counsel, the Hustead Law Firm, A Professional Corporation, submits its Clarification and Correction of Previously Submitted Exhibits to Docket No. 73 - Reply Brief to Plaintiff's Response to Defendant's Motion for Summary Judgment and Cross Motion for Summary Judgment on the Issue of Liability for Breach of Contract and Bad Faith. In support thereof, Defendant states as follows:

      1.      On May 15, 2009, Defendant filed with the Court its Reply Brief to Plaintiff's Response to Defendant's Motion for Summary Judgment and Cross Motion for Summary Judgment on the Issue of Liability for Breach of Contract and Bad Faith, with attached Exhibits W-BB. This pleading was entered into the Court's record as Docket No. 73.

2.       On May 19, 2009, undersigned counsel discovered the inadvertent omission of an Exhibit, which was to be labeled "AA" (an e-mail dated May 26, 2006, from Neal Scharmer bates labeled UFC2197).    Though Exhibit AA is referenced correctly as an e-mail on page 8 of Defendant's Reply, this exhibit was omitted and therefore all subsequent exhibits were mislabeled.    Submitted correctly, the Exhibits attached to Defendant's Reply should have been labeled "W-CC", rather than "W-BB".

3.       Defendant has attached the proper Exhibits to Docket No. 73, i.e., W-CC, which includes the proper Exhibit AA, and with the proper lettering for all subsequent Exhibits.

Dated this 18th day of May, 2009.

Respectfully submitted,

THE HUSTEAD LAW FIRM
*A Professional Corporation*


By:  /s/ Melissa W. Shisler
Patrick Q. Hustead, Esq.
Colorado Bar No. 16905
Melissa W. Shisler, Esq.
Colorado Bar No. 27537
4643 S. Ulster Street, Suite 1250
Denver, CO 80237
Telephone: (303) 721-5000
MWS@thlf.com
*Attorneys for United Fire & Casualty Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of May, 2009, I delivered a true and correct copy of the foregoing **CLARIFICATION AND CORRECTION OF PREVIOUSLY SUBMITTED EXHIBITS TO DOCKET NO. 73 - DEFENDANT UNITED FIRE & CASUALTY COMPANY'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY FOR BREACH OF CONTRACT AND BAD FAITH** to the following:

William J. Brady, Esq.
1700 Lincoln St., Suite 3800
Denver, CO 80203-4538
*Attorney for Plaintiff*

*Original Signature on File at The Hustead Law Firm*

/s/ _____
Gretchen Doyle

0501 020753

Task
to
neal S.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No.:08-CV-00391-JLK-KMT

THE NEW SALIDA DITCH COMPANY, INC., a Colorado Corporation

    **Plaintiff(s)**

v.

UNITED FIRE & CASUALTY INSURANCE COMPANY, an Iowa Corporation

    **Defendant(s)**

---

### AFFIDAVIT OF NEAL SCHARMER, ESQ.

---

    I, Neal Scharmer, being over the age of 18, and being duly sworn under oath, hereby state as follows:

    1.    I am employed in the position of General Counsel and am the Corporate Secretary of United Fire &Casualty Company ("UFC").

    2.    I have been employed by UFC as the most senior attorney on staff for more than ten years.

    3.    I am familiar with the means, methods, and record-keeping procedures UFC employs for its claims.

    4.    Specifically, when UFC receives a claim filed by or against one of UFC's policyholders, the claim is assigned a claim number. All claims in UFC are categorized by that claim number, by the name of the policyholder, and can be accessed by the claimant's name if the name has been recorded in the computer.

    5.    UFC has no means to code its claim files or search the same to identify claims involving dirt, rock or fill material of the type involved in this matter.

**EXHIBIT**

tabbies W

6.    In fact, the only one means of searching UFC's claims to determine if any current or prior claim involved the application of the Total Pollution Exclusion to dirt, rock, or fill material, UFC would have to employ one or more persons specifically for the purpose of searching each and every claim file in the company, individually, one by one, for a set number of years.

7.    Because UFC has tens of thousands of claims filed every year, the task would be costly, and overly burdensome in terms of the hours and money expended to determine even if other claims fitting this factual description exist.

8.    Further, as to the existence of such claims, all of UFC's claims, throughout the entire country, which potentially involve pollution, must be reported to me.

9.    Over the course of the last ten years, I have no recollection of having received or reviewed a claim which involved the release or migration of dirt, rock or other fill material of the type involved in the current action, other than the instant claim (claim number 0501020753).

10.    Based on the fact that all claims which involve pollution must be reported to me and because I no recollection of receiving any claims involving dirt, rock or fill material, it does not appear any claims involving the release or migration of dirt, rock or other fill material of the type involved in this action have been reported to UFC.

Further Affiant sayeth naught.

Dated this ___16ᵗʰ___ day of April, 2009.

Neal Scharmer, Esq.

STATE OF IOWA        )
                     ) ss.
COUNTY OF ___Linn___ )

Subscribed and sworn to before me by _Neal Scharmer_ this 16th day of
_April_, 2009.

WITNESS MY HAND AND OFFICIAL SEAL.

My Commission expires:



Notary Public

NANCY L. DESCOMBES
Commission Number 193143
My Commission Expires
12/23/09

04/17/2009 07:52 AM



**FILE COPY**

CRAIG W. CAIN
KRISTINE K. HAYTER*

# CAIN & HAYTER, LLP

**ATTORNEYS AT LAW**

JEFFREY L. BODILY**
DEBRA P. DEREE
JENNIFER L. WHITE***
PATRICIA K. TRINOSKY LIND
JOAN E. BURTZOS

OF COUNSEL:
CARLA M. ALBERS

COLORADO SPRINGS:
[MAIN OFFICE]
The Historic Alamo Building
128 South Tejon Street, Suite 100, Colorado Springs, Colorado 80903
Telephone 719-575-0010 Facsimile 719-575-0020

*Also admitted in Hawaii and Nebraska
**Also admitted in California
***Also admitted in Texas

DENVER:
3773 Cherry Creek North Drive, Suite 575, Denver, Colorado 80209
Telephone 303-331-6474 Facsimile 303-399-6480

WWW.CAINHAYTER.COM

FROM THE OFFICE OF:
DEBRA P. DEREE
DDEREE@CAINHAYTER.COM

May 25, 2006

**_Via Facsimile & U.S. Mail_**
**(303) 650-4986**

Mr. Bill Newman, Claims Supervisor
United Fire Group
P. O. Box 850
Westminster, CO 80030

RE:      Claim No.:        **1040501020753**
         Insured:          **New Salida Ditch, Inc.**
         Date of Loss:     **May 2005**
         C&H No.:          **800-06-3**

Dear Mr. Newman:

I am in receipt of your letter dated May 4, 2006, assigning this firm as coverage counsel for the New Salida Ditch, Inc. matter, claim number 1040501020753. We have also received a CD disk which appears to be the claim file for this matter. We have had an opportunity to review the claim file and conduct additional research, and the following represents our evaluation.

Documents which have been provided for our review include: correspondence from Bill Newman to Kristine Hayter; Certified Copy of Commercial General Liability Policy number 20111703 for New Salida Ditch, Inc.; correspondence from Attorney David Dodero to Bill Newman dated April 27, 2006; correspondence from Attorney David M Scanga to Bill Newman dated April 3, 2006; correspondence from Bill Newman to David M. Scanga

Page 1 of 27

UFC 2227



EXHIBIT
X

*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

dated March 29, 2006; copy of Notice of Violation/Cease and Desist/Clean-Up Order; log notes; correspondence from Attorney David Scanga to Ron Reihmann dated March 13, 2006; correspondence from Department of the Army Corps of Engineers dated March 2, 2006; correspondence from State of Colorado to U.S. Army Corps of Engineers dated February 23, 2006; various correspondence from individuals and organizations regarding after-the-fact permit request; Liability Cap Report; United Fire Group Memorandum dated March 22, 2006; and Denial of Certification under 33 U.S.C. § 1341 filed by New Salida Ditch Company.

## I.    Alleged Claims

The New Salida Irrigation Ditch Company (hereinafter "Ditch Company") was established in approximately 1882 to provide water for agricultural purposes along the Arkansas River between U.S. Highway 285 and State Highway 291 in Chaffee County, Colorado. The Ditch Company constructed the ditch on federal land with a direct grant of easement pursuant to Section 9 of the Act of July 26, 1866. When necessary, the Ditch Company made repairs to the irrigation ditch.

In 2005, the Ditch Company undertook work on the irrigation ditch. The Ditch Company claims that repairs to the ditch were necessitated by a breach which occurred in 2005. The "repairs" were completed in April, 2005. The repairs included the addition of materials to the riverbank for stabilization. Some of the material was below the high water line.

On March 6, 2005, the Colorado Department of Public Health and Environment Water Quality Control Division (hereinafter "CDPHE") issued a NOTICE OF VIOLATION/CEASE AND DESIST/CLEAN-UP ORDER. The Notice provides, in pertinent part:

> 7.    In or about May 2005, New Salida Ditch Company initiated land-disturbing construction activities adjacent to the Ditch, which included the disturbance of more than five acres of total land and the placement of disturbed soil and rock ("fill material") directly in and along at least one thousand five hundred eighty four (1,584) linear feet of the Arkansas River, for the purpose of creating additional land between the Ditch and the Arkansas River's east bank (the "Project"). To date, the disturbed land at the Project remains unstabilized with no pollution controls in place to prevent erosion of the disturbed slopes or further discharges of soil and sediment to the Arkansas River. If

Page 2 of 27

*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

> not remediated, the disturbed soil and rock ("fill material") at the Project pose imminent and substantial endangerment to the beneficial uses of the Arkansas River.
>
> ...

9. Soil and rock are "pollutants" as defined by § 25-8-103(19), C.R.S. and its implementing permit regulation, 5 CCR 1002-61, §61.2(76).

10. Division records establish that New Salida Ditch Company does not have any permits authorizing the discharges of soil and rock and/or stormwater discharges from the Project.

11. New Salida Ditch Company's failure to obtain CDPS permit coverage for the Project constitutes violation(s) of §25-8-501(1) C.R.S., 5CCR 1002-61, §61.3(1)(a), and 5 CCR 1002-61, §61.3(2).

The CDPHE concluded that the Ditch Company had violated the following:

> C.R.S. § 25-8-501(1) which provides in part: "No person shall discharge any pollutant into any state water from a point source without first having obtained a permit from the division for such discharge, and no person shall discharge into a ditch or man-made conveyance for the purpose of evading the requirement to obtain a permit under this article."
>
> 5 CCR 1002-61, § 61.3(1)(a) which provides in part: "No person shall discharge any pollutant into any state water from a point source without first having obtained a permit from the Division for such discharge..."
>
> 5 CCR 1002-61, § 61.3(2), which provides in part: "...discharges of stormwater as set forth in 61.3(2) and 61.4(3) are point sources requiring a permit and, "The following discharges composed entirely of stormwater are required to obtain a permit. (ii) A stormwater discharge associated with industrial activity."



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

The CDPHE ordered the Ditch Company to do the following:

12.  Cease and desist from all violations of the Colorado Water Quality Control Act, §§25-8-101 to 703, C.R.S. and the permit regulations promulgated thereunder:

...

13.  Within seven (7) calendar days ... New Salida Ditch Company shall retain the services of a qualified individual or entity, specifically experienced in stream restoration and/or stream channel improvement activities, to expeditiously evaluate the Project and make recommendations for the removal and/or mitigation of all soil and rock ("fill material") deposited into and along the Arkansas River,....

14.  Within fourteen (14) calendar days ... New Salida Ditch Company shall submit to the Division: a) a written report on the evaluation and recommendations identified by paragraph 13 above; b) a specific written plan and implementation schedule, not to extend beyond April 30, 2006, for the removal and/or mitigation of all soil and rock ("fill material") that was deposited into, and which eroded or migrated into, the Arkansas River, and; c) a specific written plan and implementation schedule, not to extend beyond April 30, 2006, for temporarily and permanently stabilizing all disturbed areas of the Project....

15.  Within fourteen (14) calendar days ..., New Salida Ditch Company shall prepare and submit to the Division, a complete application for Project coverage under CDPS General Permit, Number COR-03000, for Stormwater Discharges Associated with Construction Activity. Additionally, New Salida Ditch Company shall submit, with the permit application, a written copy of its Stormwater Management Plan("SWMP") for the Project.

16.  Within thirty (30) calendar days ..., New Salida Ditch Company shall submit to the Division complete

Page 4 of 27

Mr. Bill Newman, Claims Supervisor
Claim No.: 1040501020753
May 25, 2006

information regarding the nature of construction activities associated with the Ditch, including: a) the exact date that the construction activities, as described in paragraph 7 of this Order, commenced at the Project; b) a description of any other construction activities that have occurred, in which one or more acres of total land were disturbed, since July 2002, including the date(s) and exact area(s) of disturbance, and; c) a description of the Best Management Practices ("BMPs"), if any, that were implemented to control pollutant discharges from the construction activities identified by a) and b) of this paragraph.

The Ditch Company, pursuant to agreement with CDPHE, submitted an after the fact permit request, but did not waive its right to maintain that a permit was not required for maintenance of the ditch. In response, CDPHE filed a public notice. Numerous objections were received in response to the public notice. Included in the objections was correspondence dated February 15, 2006 from the Environmental Protection Agency. The correspondence provided:

According to the Public Notice, and based on a site visit by Brent Truskowski of my staff on February 7, 2006, the Applicant side cast spoil from a ditch maintenance project along the slope of the Arkansas River, resulting in the destruction of riparian habitat, and loss of several feet of river width along a significant length of the river. A major concern is that a rise in the river level from spring runoff and summer thunderstorms will wash a significant portion of the unconsolidated fill into the river, resulting in the fines portion of the fill washing down the river resulting in significant damage to the aquatic ecosystem and adjacent properties.

The CWA §404(b)(1) guidelines are clear in the required protocol the Corps must require an applicant to follow prior to the issuance of a permit. In this case the Applicant clearly did not consider the guidelines when undertaking the project. In this case, the action does not appear to be the least damaging practicable alternative (230.10(a)); may violate state water quality standards (230.10(b)); may result in "significant degradation of waters of the United States" (230.10(c)), and no steps were taken to "minimize adverse impacts" (230.10(d)).

Page 5 of 27

*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

Therefore, in accordance with §404 of the Clean Water Act, the Corps should deny the application, and require the Applicant to remove all fill from the Arkansas River. The removal of the fill must be done immediately, or some interim measures taken to temporarily stabilize the work prior to spring floods to allow planning for the ultimate removal of the unauthorized fill material. Any other alternative is unacceptable because it will allow impacts to the Arkansas River that will take years, if not decades to remedy. As such, EPA strongly recommends that the Corps utilize its authority under 33 CFR Part 326.3(d), Initial Corrective Measures, to require the immediate removal of the fill material prior to spring run-off in order to minimize environmental harm and downstream property damage. Due to the flagrant nature of these violations, EPA recommends that you inform the Applicant that, if they are unwilling to comply with the Initial Corrective Measures, the Corps will refer this matter to the EPA for enforcement consideration in accordance with the January 19, 1989 Memorandum of Agreement between the Corps and EPA Concerning Federal Enforcement of Section 404 of the Clean Water Act.

Also received during the public notice period was correspondence from Attorney Martin Holland on behalf of Dr. Ronald M. Sega. According to the correspondence, Dr. Sega is a land owner of a portion of the property "where the work was performed without a permit." The correspondence objected to the after-the-fact permit request and specifically identified damage "to the riverbank area including destruction of trees and habitat areas...." We are unaware of any claim being asserted against the Ditch Company by Dr. Sega.

## II.    Coverage Analysis

As a general premise, an insurance policy is a contract and general rules of contract interpretation apply. Notwithstanding the aforementioned, review of an insurance policy contract is undertaken with the principal that any ambiguity in the language of the policy will be construed against the insurer. *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236 (Colo. 1993); *Colard v. American Family Mut. Ins. Co.*, 709 P.2d 11 (Colo. App. 1985). Following, are those provisions of the policy applicable to this discussion.

*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

## SECTION 1 - COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. **We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" for which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result....**

   b. **This insurance applies to "bodily injury" and "property damage" only if:**

      (1) **The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"**

      ...

2. **Exclusions**

   This insurance does not apply to:

   j. **Damage to Property**

      **"Property damage" to:**

      (1) **Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property**

Page 7 of 27



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

for any reason, including prevention of injury to a person or damage to another's property;

...

(5)  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6)  That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

...

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.
Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k.  Damage To Your Product
"Property damage" to "your product" arising out of it or any part of it.

l.  Damage To Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work out of which the damage arises was performed on your behalf by a subcontractor.

## SECTION V - DEFINITIONS

13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general

UFC 2234



harmful conditions.

15.    "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

16.    "Products-completed operations hazard":

    a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work"...

17.    "Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; ...

18.    "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged....

22.    "Your Work":

    a.    Means:

        (1)    Work or operations performed by you or on your behalf; and

        (2)    Materials, parts or equipment furnished in connection with such work or operations.

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

Mr. Bill Newman, Claims Supervisor
Claim No.: 1040501020753
May 25, 2006

...

f.  **Pollution**

(1)  "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time

(2)  Any loss, cost or expense arising out of any:

(a)  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b)  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

A.  <u>**Whether the Notice of Violation/Cease and Desist/Clean-Up Order constitutes a "suit" under the policy.**</u>

The policy provisions applicable to an analysis of this issue provide:

SECTION 1 - COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.  **Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" for which this insurance applies. We

Page 10 of 27

UFC 2236



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

> **will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result....**

Suit is defined as:

> **18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged....**

Based upon the language of the policy, the insurer is legally obligated to pay damages as a result of "property damage" for which the insurance applies. The insurer also has the "right and duty to defend the insured against any 'suit' seeking those damages." The issue is whether the CDPHE Notice constitutes a "suit" under the policy.

We would note that the Ditch Company has made a demand upon United Fire to provide a defense to the CDPHE Notice, specifically identifying both counsel and experts to be retained by United Fire in defense of the CDPHE Notice. The pivotal issue is whether the Notice of Violation/Cease and Desist/ Clean-Up Order constitutes a "suit" under the policy.

The CDPHE Notice would constitute a "suit" under the policy. The case of *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606 (Colo. 1999) is on point with respect to this issue. In *Compass*, the Cities entered into an agreement regarding the construction and operation of a wastewater treatment facility, the Bi-City Wastewater Treatment Facility. *Id.* at 610. The Bi-City Wastewater Treatment Facility disposed of its sewer sludge at the Lowry Landfill. *Id.* at 611. In 1985, the EPA sent a notice to Englewood that it was one of many Potentially Responsible Parties (PRPs), for costs and clean up associated with the Lowry Landfill due to the disposal, treatment, or transportation of hazardous substances at the Lowry Landfill. *Id.* Among other issues raised, the insurers challenged whether the PRP letters constituted a "suit" under the policy which would trigger the insurer's duty to defend. Specifically, the insurers contended that "the policies do not provide coverage for administrative actions...." *Id.* at 622.

The Colorado Supreme Court disagreed. The Court, relying upon the holding in *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 445 Mich. 558, 519 N.W.2d 864

Page 11 of 27



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

(1994), held that "the term 'suit' as used in the insurance policies encompasses not only traditional lawsuits filed in court but also coercive administrative actions such as those initiated by PRP letters under CERCLA." *Id.* Based upon the foregoing, the CDPHE Notice would constitute a "suit" under the policy, thereby triggering the insurer's duty to defend.

B.    **<u>Whether there was an "occurrence" under the policy.</u>**

The applicable policy provisions provide:

**SECTION 1 - COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.    **Insuring Agreement**

    a.    **We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" for which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result....**

    b.    **This insurance applies to "bodily injury" and "property damage" only if:**

        (1)    **The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"**

Occurrence is defined as:

**SECTION V - DEFINITIONS**

Page 12 of 27

UFC 2238

*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

13.  **"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.**

As a threshold matter, whether the alleged actions undertaken by the Ditch Company constitute an "occurrence" under the policy must be determined. The policy at issue defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not defined in the policy; however, Colorado courts have held that accident means "an unanticipated or unusual result flowing from a commonplace cause." *Fire Ins. Exchange v. Bentley*, 953 P.2d 1297, 1301 (Colo. App. 1998).

Based upon the foregoing, it is likely that a court would consider the actions of the Ditch Company to constitute an "occurrence" under the policy. Although the actions were intentional, the results were not anticipated by the Ditch Company. Certainly, an argument can be made that the results should have been anticipated by the Ditch Company. In *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo. 1991), it was alleged that the insured had discharged pollutants into the California Gulch as a result of mining operations. *Id.* The insurer, New Hampshire Insurance Company, argued that the discharge did not constitute an occurrence under the policy. In rejecting the insurer's contention, the Colorado Supreme Court held that:

> **(1) because there were not claims asserting Hecla Mining expected or intended the discharge of pollutants into the California Gulch as a result of its mining operations, there was an "occurrence" within the meaning of the insurance policy that was "unexpected and unintended"; and 2) the phrase, 'neither expected nor intended' excludes only 'those damages that the insured knew would flow directly and immediately from its intentional act."**

*City of Englewood v. Commercial Union Assur. Companies,* 940 P.2d 948, 954 (Colo. App. 1996) (*reversed on other grounds); Hecla*, 811 P.2d at 1086-88. Consequently, based upon the foregoing, it is our opinion that the work performed by the Ditch Company would constitute an occurrence under the policy.

C.  ***Whether Exclusions j(1)(5) and (6) "Damage to Property" preclude coverage based upon the allegations of the Notice of Violation/Cease an Desist/Clean-Up Order.***

Page 13 of 27



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

With respect to Exclusion j(1), Attorney Dodero points out that the claimed property damage involved property other than property owned, rented or occupied by the insured. Specifically, Attorney Dodero points to the claims of property damage to the railroad, the United States, as set forth in correspondence from the Bureau of Land Management dated February 10, 2006 and Dr. Sega, as set forth in Attorney Holland's correspondence on behalf of Dr. Sega dated February 9, 2006. These sources indicate that some property damage was sustained by a third party. Because there was claimed property damage to property owned by another, Attorney Dodero contends that Exclusion j(1) is inapplicable.

With respect to your correspondence of May 4, 2006 regarding Attorney Dodero's claim of damage to third parties, we do note that neither the railroad, the United States nor Dr. Sega have alleged any claim against the Ditch Company. Notwithstanding the same, the Ditch Company has been ordered to clean-up this area. Moreover, we would note that the clean-up to the ditch and River itself, should result in the clean-up of the third-party property. Arguably, there is an issue with respect to "ownership" of the Arkansas River. We would note that the Notice requires the Ditch Company to "make recommendations for the removal and/or mitigation of all soil and rock ("fill material") ***deposited into*** and along the Arkansas River..." (Emphasis added.) The Ditch Company owns the water rights, not the property rights.



A brief discussion regarding easements is appropriate at this juncture. An easement is defined in part as "[a] right of use over the property of another." *Black's Law Dictionary* 509 (6th ed. 1990). Colorado law provides that mutual ditch companies "operate on the premise that the company owns the water rights and other property, including ditch easements, and the shareholders have the right to use the water on their lands." *East Ridge of Fort Collins, LLC v. Larimer and Weld Irr. Co.*, 109 P.3d 969 (Colo. 2005). *See also*, *Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501 (Colo. 1982); *Jacobucci v. District Court*, 189 Colo. 381, 541 P.2d 667 (Colo. 1975).

Based upon the foregoing, the Ditch Company owns the easement over the irrigation ditch. Accordingly, coverage would be excluded for repairs to the irrigation ditch which constitutes part of the easement. If the fill was deposited only on the Ditch Company's easement, then arguably, the exclusion would apply. If, as Attorney Dodero contends, the fill was placed on property was not part of the Ditch Company's easement, but the Ditch Company is being ordered to clean-up those areas, then the exclusion would probably not apply.

Exclusion j(1) is known as an "owned property exclusion." *Browder v. United States Fidelity & Guaranty Co.*, 893 P.2d 132 (Colo. 1995). Although there is no Colorado case on point, the case of *Cedar Lane Investments v. St. Paul Fire & Marine Ins. Co.*, 883 P.2d 600 (Colo. App. 1994) is persuasive.

Page 14 of 27





*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

Cedar Lane owned property which it had previously leased to a precious metal recovery business. *Id.* at 602. While leased, the soil became contaminated by various products utilized by the tenant. *Id.* The Colorado Department of Health and the EPA issued an administrative order directing Cedar Lane to clean up the contamination. *Id.* After incurring the expense necessitated by the clean up, Cedar Lane filed a claim with their insurer, St. Paul, to recover their expenses. *Id.*

The issue in *Cedar Lane* centered on the owned property exclusion. St. Paul contended that there was no coverage under the policy due to the owned property exclusion, to which the trial court agreed. *Id.* In agreeing with the trial court, the Court of Appeals held that the exclusion was valid. More importantly, the Court held:

> **If, as the trial court concluded, a third party's property was damaged while it was located at the subject property, or if pollutants released from that property traveled to a third party's land and caused damage, a genuine issue of fact might exist as to whether the "Coverage Limitation Endorsement" served to exclude that claim.**



*Id.* at 603. Although not expressly stated, the Court of Appeals implies that property damage to a third-party's land, which resulted from damage to the insured's property, would not be subject to the owned property exclusion. Based upon the language of Exclusion j(1) and Colorado law, Exclusion j(1) likely does not exclude coverage in this case.

Exclusions j(5) and (6) provide:

**Exclusions**

**This insurance does not apply to:**

**j.      Damage to Property**

**(5)      That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or**

**(6)      That particular part of any property that must be restored, repaired or replaced because "your work"**

Page 15 of 27



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

was incorrectly performed on it.

...

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

## SECTION V - DEFINITIONS

16.    "Products-completed operations hazard":

A.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1)    Products that are still in your physical possession; or

(2)    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed

...

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or

Page 16 of 27





*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

> replacement, but which is otherwise complete, will be treated as completed.

22. **"Your Work":**

a. **Means:**

   (1) **Work or operations performed by you or on your behalf; and**
   (2) **Materials, parts or equipment furnished in connection with such work or operations.**

An insurer bears the burden of proof to establish the applicability of an exclusion to coverage. *DeWitt v. Shelter General Ins. Co.*, 784 P.2d 819, 820 (Colo. App. 1989). Any exclusion must be "clear and specific" to be enforceable. *Id.* at 820-821; *Coxen v. Western Empire Life Ins. Co.*, 168 Colo. 444, 452 P.2d 16 (1969).

With respect to Exclusion j(5), the case of *McGowan v. State Farm Fire and Casualty Co.*, 100 P.3d 521 (Colo. App. 2004) addressed identical language. In *McGowan*, the McGowans contracted with Eagle Summit Construction Company (hereinafter "Eagle Summit") for the construction of a 3,200 square foot house. *Id.* at 522. During the construction process, the McGowans noticed significant defects with the construction of the residence. *Id.* As a result of these issues, the McGowans terminated the contract with Eagle Summit and contracted with another contractor to complete construction. *Id.*

Thereafter, the McGowans brought a claim against Eagle Summit alleging claims of negligence, fraud, breach of contract and conversion. *Id.* Eagle Summit failed to Answer and a default judgment was entered against Eagle Summit in the amount of $399,857.93. *Id.* at 523. The McGowans then attempted to collect on the judgment by writ of garnishment against Eagle Summit's insurer, State Farm. *Id.* State Farm contended that the claims alleged by the McGowans were excluded from coverage. *Id.* The trial court agreed and the McGowans appealed. *Id.*

In upholding the trial court, the Court of Appeals looked to the language of the exclusion, which is identical to the language in the policy at issue. The Court of Appeals noted that the exclusion at issue does not exclude coverage for faulty workmanship because the same is considered a business risk which should be borne by the insured. *Id.* at 525. Moreover, the Court of Appeals held that the exclusion was "written in clear and specific language" and was unambiguous. *Id.*; *See Alverson v. Northwestern Nat'l Cas.*

UFC 2243




*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

Co., 559 N.W.2d, 234, 236 (S.D. 1997).

*Worsham Constr. Co. v. Reliance Ins. Co.*, 687 P.2d 988 (Colo. App. 1984) and *Colard v. American Family Mut. Ins. Co.*, 709 P.2d 11 (Colo. App. 1985) are also illustrative. In *Worsham* and *Colard*, both policies contained exclusions relating to the quality of the insured' work, contained within the "your work" exclusion and liability assumed in a contract exclusion. The respective courts found the exclusions ambiguous and construed the same against the insured.

By contrast, *Union Ins. Co. v. Kjeldgaard*, 820 P.2d 1183 (Colo. App. 1991) addressed the issue of defective workmanship. In *Union*, Kjeldgaard sought coverage for damages caused by the defective construction of a horse barn, stall and arena by Union's insured. The Court of Appeals upheld the trial court's grant of summary judgment with respect to the work product exclusion, finding that coverage was excluded.

Attorney Dodero argues that Exclusion j(5) is inapplicable because the CDPHE Notice does not indicate that the Ditch Company was performing operations on the banks of the Arkansas River and that the Notice indicates damage to property owned by third parties. In addition, Attorney Dodero contends that the language of the policy is in the present tense which indicates that the property damage must occur while the insured is working on the property.

Although Colorado does not have a case on point addressing this issue, the case of *Acceptance Ins. Co. v. Ross Contractors, Inc.*, N.W. 2d WL 1870688 (Minn. App. 2005) provides guidance. In *Acceptance*, the Court was faced a contract provision identical to the one at issue. Ross argued, as is Attorney Dodero, that the language of the policy was written in the present tense; therefore, the exclusion is applicable only to projects in progress. *Id.* In *Acceptance*, the Court agreed with Ross. Specifically, the Court held that for the exclusion to apply, the work must be in progress. The fact that the work was already complete made the exclusion inapplicable. *Id.*

It is our opinion that the reasoning of *Acceptance* may be adopted by Colorado. Specifically, because the language of the policy is written in the present tense, the exclusion does not apply to damages "caused" by completed works. This is consistent with well established Colorado law which provides that an insurer bears the burden of proof to establish the applicability of an exclusion to coverage. *DeWitt v. Shelter General Ins. Co.*, 784 P.2d 819, 820 (Colo. App. 1989). Any exclusion must be "clear and specific" to be enforceable. *Id.* at 820-821; *Coxen v. Western Empire Life Ins. Co.*, 168 Colo. 444, 452 P.2d 16 (1969). In the present action, it is likely that a Colorado court would require that the work be in progress for Exclusion j(5) to be applicable.

UFC 2244



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

    With respect to Exclusion j(6), the "products completed" exclusion, it does not appear to apply to exclude coverage. The policy provides that "Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard." Moreover, the policy defines "products-completed operation hazard" to include "all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except: ... (2) Work that has not yet been completed or abandoned." Work is considered to be complete "(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." There is no indication that the work that the Ditch Company undertook was not complete. As such, it does not appear that Exclusion j(6) would apply to exclude coverage.

    Based upon the foregoing, the Exclusions contained in (j)(1)(5)(6) do not appear to be applicable.



> ### D.    *Whether Exclusion 2(l) "Damage to Your Work", of the policy would preclude coverage for the claims alleged in the Notice of Violation/Cease and Desist/Clean-Up Order.*

Exclusion 2(l) provides:

> **"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".**
>
> **This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.**

    At the outset, it should be noted that a member of the Ditch Company, Chris Nachtrib, undertook the work to the irrigation ditch. Accordingly, the exception to the exclusion would be inapplicable as a subcontractor did not perform the work.

    "Products-completed operations hazard" and "Your work" are defined by the policy as:

**SECTION V - DEFINITIONS**

Page 19 of 27

UFC 2245

*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

16.     "Products-completed operations hazard":

A.     Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1)     Products that are still in your physical possession; or

(2)     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed

...

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

22.     "Your Work":

a.     Means:

(1)     Work or operations performed by you or on your behalf; and

(2)     Materials, parts or equipment furnished in connection with such

Page 20 of 27





*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

**work or operations.**

Applying general rules of contract interpretation to the policy language, the policy would exclude damage to the irrigation ditch caused by the Ditch Company. This exclusion would not exclude damage to property owned by third-parties as discussed herein applicable to Exclusions j(5) and (6).

### E. _Whether the Total Pollution Exclusion Endorsement excludes coverage for the claims alleged in the Notice of Violation/Cease and Desist/Clean-Up Order._

The policy provides:

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

**This endorsement modifies insurance provided under the following:**

**...**

**f.    Pollution**

**(1)    "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.**

**(2)    Any loss, cost or expense arising out of any:**

**(a)    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or**

**(b)    Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing,**

Page 21 of 27



Mr. Bill Newman, Claims Supervisor
Claim No.: 1040501020753
May 25, 2006

> treating, detoxifying or neutralizing, or in ay way
> responding to, or assessing the effects of,
> "pollutants".

The CDPHE Notice alleges that the Ditch Company discharged a pollutant in the Arkansas River. CDPHE includes soil and rock as pollutants, citing § 25-8-103, C.R.S. For clarification, § 25-8-103, C.R.S. provides:

> **(15)** **"Pollutant" means dredged spoil, dirt, slurry, solid waste, incinerator residue, sewage, sewage sludge, garbage, trash, chemical waster, biological nutrient, biological material, radioactive material, heat, wrecked or discarded equipment, rock, sand, or any industrial, municipal, or agricultural waste.**

The policy defines "pollutant" as:

> **SECTION V - DEFINITIONS**
>
> **15.** **"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.**

Based upon the statute and the language of the policy, the rock and soil would constitute pollutants.

The next inquiry relates to whether the Total Pollution Exclusion Endorsement is applicable to the present claims. Attorney Dodero contends that the Endorsement is inapplicable to the present action because the Ditch Company did not receive a copy of the Endorsement when the policy was renewed for the 2005-2006 period. Attorney Dodero refers to § 10-4-110.5, C.R.S. and *Tepe v. Rocky Mountain Hospital and Medical Services*, 893 P.3d 1323 (Colo. App. 1994).

Section 10-4-110.5(1), C.R.S. provides, in pertinent part:

> **(1) No insurer shall increase the premium unilaterally or decrease the coverage benefits on renewal of a policy of insurance that provides coverages on commercial exposures such as general comprehensive liability, ... unless the insurer**

Page 22 of 27





*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

mails by first-class mail to the named insured, at the last address shown in the insurer's records, as least forty-five days in advance a notice, accompanied by the reasons therefor, stating the renewal terms and the amount of premium due....

The Court in *Tepe, supra* held:

... an insurer who fails to notify the insured of limitations regarding coverage may be precluded from relying on the existence of such limitations to avoid liability. *Id.* at 1328; *Jarnagin v. Banker's Life & Casualty Co.*, 824 P.2d 11 (Colo. App. 1991).

Based upon the information provided, every policy issued to the Ditch Company, beginning on April 4, 1998, has contained a Total Pollution Exclusion Endorsement. More importantly, the Total Pollution Exclusion Endorsement applicable to the present action, CG 21 49 09 99, has been in effect and part of each of the Ditch Company's policies since April 4, 2000. Based upon § 10-4-110.5, C.R.S., an insurer is not required to advise an insured, when renewing the policy, that there are no changes; rather, the insurer is charged only with notifying the insured of changes in the policy which affect the price or decrease coverage. Based upon our understanding, a copy of the Total Pollution Exclusion Endorsement was sent with the 2000-2001 policy renewal. Pursuant to the statute, an insurer is only required to send any subsequent endorsement if that endorsement changed. In the present action, the Endorsement has not changed since the 2000-2001 renewal period.



Attorney Dodero contends that he attached a complete copy of the insurance policy in the possession of the Ditch Company for the renewal policy for the period April 4, 2005 to April 4, 2006 and that the Total Pollution Exclusion Endorsement was not part of the policy. We would also note that United Fire enclosed a "Notice to Policyholders" which identifies changes to the policy which may potentially decrease the benefits. The Total Pollution Exclusion Endorsement is not identified in this Notice to Policyholders. It is our understanding, from the documents received, that this Endorsement has remained in effect and unchanged since April 4, 2000. Moreover, we would note that the Endorsement is identified in the "Forms Supplemental Declarations."

*Tepe, supra*, stands for the proposition that when "[e]xclusionary language that conflicts with the objectively reasonable expectations of the insured is not enforceable, even if a "painstaking study of the policy provisions would have negated those expectations.'" *Tepe*, at 1328; *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024 (Colo. App. 2003). "However, the doctrine of reasonable expectations will be applied only if the contract is

Page 23 of 27



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

ambiguous." *Dupre*, at 1028. Moreover, Colorado law is well settled that an insured has a duty to read the policy. *Usick v. American Family Mut. Ins. Co.*, 131 P.3d 1195, 1201 (Colo. App. 2006). "'The doctrine of reasonable expectations supplements, but does not substitute for, the rule that insurance policies are to be considered according to well-settled principles of contract construction," and insured has duty to read policy." *Dupre*, at 1028.

As aforementioned, Attorney Dodero contends that the insured did not receive a copy of the Total Pollution Exclusion Endorsement with the renewal. Unfortunately, there are no Colorado cases on point addressing this issue. Interestingly, there are two (2) cases out of Washington state which address the issue of whether an endorsement, which the insured contends was not received, was applicable.

In *Sowa v. National Indemnity Co.*, 688 P.2d 865 (Wash. 1984), the insured claimed, *inter alia*, that he had not received the insurer's endorsement excluding underinsured motorists coverage, and therefore, he was entitled to coverage. In rejecting the insured's contention, the Washington Court first noted that the insurer supplied an Affidavit averring that the endorsement was sent to the insured. *Id.* at 870. As such, the Court held that an "insurer need only prove that the endorsements were sent, not that they were received." *Id.*



By contrast, in *McGreevy v. Oregon Mut. Ins. Co.*, 876 P.2d 463 (Wash. App. 1994), the Court was again faced with the issue of an insured claiming that an anti-stacking endorsement had not been received. *Id.* The insurer contended that reference to the endorsement, OMG-24, was present on the declarations page after 1980; therefore, the insured had notice of the change. *Id.* In rejecting the insurer's contention, the Court held that "[w]ithout receipt of the actual endorsement, which the jury concluded she did not receive, the notation would not have been meaningful." *Id.* at 868.

*McGreevey* is somewhat analogous to § 10-4-110.5(1), C.R.S. Specifically, the Court noted that the OMG-24 endorsement limited the insured's benefits, and therefore, the insured should have been provided notice.

Despite the foregoing, Colorado has codified an insurer's duty with respect to renewal policies, (i.e. with renewal policies, an insurer is required to notify the insured of an increase in premiums or a decrease in the coverage). § 10-4-110.5(1), C.R.S. In the present action, the Total Pollution Control Exclusion Endorsement has been in effect, unchanged, for six (6) years. Accordingly, pursuant to statute, United Fire was not required to resend the Exclusion because it did not decrease the Ditch Company's coverage.

The case of *American Fire & Casualty Ins. Co. v. Manzo*, 347 N.J. Super. 100, 788 A.2d 925 (N.J. App. 1002), although not on point, is helpful to our analysis. In *Manzo*, the



Page 24 of 27



*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

Court addressed, *inter alia*, a dispute about allocation of coverage between American Fire and Farmers Insurance. Specifically, American Fire contended that the excess Farmers policy applied to the subject loss based upon an ambiguity in the policy. *Id.*

The Farmers policy declarations page identified specific locations of property for which coverage applied. *Id.* at 930 - 931. The location of the injury was not one (1) of the ten (10) properties identified. *Id.* American Fire argued that there was language in the policy which provided that coverage would apply to "anywhere in the world." *Id.* at 930. American Fire contended that, because the language of the policy (i.e., "anywhere in the world"), and the specific locations identified in the declarations page were in conflict, the policy must be construed against Farmers and in favor of coverage. *Id.* In rejecting American Fire's contention, the New Jersey court held "that 'boilerplate text contained elsewhere in the policy should not override the declarations sheet." *Id.* at 931. (Citations omitted.)

Although *Manzo* addressed a perceived conflict between the language of the declarations page and the language of the policy itself, it is helpful to an acknowledgment of the importance of the declarations page.

It should be noted that Colorado has examined the scope of a qualified pollution exclusion. As applicable to the endorsement at issue, the courts have defined "discharge, dispersal, release, or escape." Specifically, Colorado courts have concluded that the terms, "discharge, dispersal, release, or escape" refer to the:

> **release of pollutants from an area of containment. Specifically, in *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606 (Colo. 1999), we held that the initial placement of wastes in an unlined landfill does not necessarily constitute a "discharge, dispersal, release or escape" of pollutants into the environment. *Id.* at 616-18. We reasoned that the phrase does not refer to the initial placement of wastes in an unlined landfill. *Id.* at 617. Rather, we explained that the phrase "carr[ies] the connotation of the issuance of a substance from a state of containment; none of the terms is normally used to describe the placement of a substance into an area of confinement." *Id. [citation omitted]*. Therefore, we concluded that a "discharge, dispersal, release or escape" - - which we termed "the relevant polluting event" for purposes of qualified pollution exclusion clauses - - is the "release of pollutants from a containment area." *Id.* Thus, we have held that qualified pollution exclusion clauses do not preclude coverage for the initial placement of wastes into containment areas.**

Page 25 of 27

UFC 2251





*Mr. Bill Newman, Claims Supervisor*
*Claim No.: 1040501020753*
*May 25, 2006*

*Cotter Corp. v. American Empire Surplus Ins. Co.*, 90 P.3d 814, 820-821 (Colo. 2004). In the present action, the "relevant polluting event" was the release of the soil and rock from the area of containment.

Colorado law is well settled that the reasonable expectations of the insured "'[do] not substitute for the rule that insurance policies are to be considered according to well-settled principles of contract construction,' and insured has duty to read [the] policy." *Dupre*, at 1028. We would note that, consistent with the representations from United Fire, that the Ditch Company received the actual Endorsement and five (5) notices of the Total Pollution Exclusion Endorsement set forth in the Declarations, between April 4, 2000 and April 4, 2005. Section 10-4-110.5(1), C.R.S. requires an insurer to specifically notify the insured of changes in the policy which decrease coverage upon renewal. In this case, coverage was not reduced in the renewal with respect to the pollution exclusion, but rather, coverage remained the same.

One final point, Attorney Dodero, in his Response on behalf of the Ditch Company to CDPHE, argues that some of the claimed damages may have been the result of a 2005 blow out. It is our opinion that this is unrelated to whether there is coverage under the policy and strictly relates to the issue of causation.



Notwithstanding the aforementioned, it is possible that the Court will place the burden on the insurer to establish that a copy of the Endorsement was sent to the insured.

### F.    *Whether United Fire has a Duty to Defend.*

Colorado courts have consistently held that the duty to defend is broader than the duty to indemnify and that these duties are viewed separately. *TerraMatrix, Inc. v. U.S. Fire Ins. Co.*, 939 P.2d 483 (Colo. App. 1997). If the complaint alleges more than one claim, and a duty to defend arises from any one of those claims, a duty to defend the complaint, in its entirety, arises. *Horace Mann Ins. Co. v. Peters*, 948 P.2d 80 (Colo. App. 1997) (cert. granted December 22, 1997).

An insurer seeking to avoid its duty to defend has a heavy burden. *TerraMatrix, supra; Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo. 1991). An insurer has a duty to defend unless it can show:

1.    the allegations in the complaint against the insured describe only situations which are within policy exclusions; and
2.    there is no factual or legal basis on which the insurer might be held liable to indemnify the insured. *Hecla, supra.*

Page 26 of 27



UFC 2252



·Mr. Bill Newman, Claims Supervisor
Claim No.: 1040501020753
May 25, 2006

An appropriate course for an insurer who does not believe that it has an obligation to defend can be to provide a defense for the insured under a reservation of rights to seek reimbursement from the insured. *Id.*

### III.   CONCLUSION

Based upon the foregoing, it is our opinion that the claims alleged in the Notice of Violation/Cease and Desist/Clean-Up Order of March 6, 2005 would constitute a "suit" under the policy. Moreover, it is our opinion that, due to the inadvertent nature of the discharge of pollutants, that the same would constitute an occurrence under the policy.

With respect to Exclusions j(1)(5) and (6), it is our opinion that the same would not preclude coverage in the present action. However, it is our opinion that the Total Pollution Exclusion Endorsement would exclude coverage in this case.

As set forth herein, an insurer's duty to defend is much broader than its duty to indemnify. However, an insurer does not have a duty to defend if:

1.   **the allegations in the complaint against the insured describe only situations which are within policy exclusions; and**

2.   **there is no factual or legal basis on which the insurer might be held liable to indemnify the insured.** *Hecla, supra.*

In the present action, pursuant to § 10-4-110.5(1) C.R.S., United Fire did not have a duty to resend the Total Pollution Control Exclusion Endorsement with the 2005-2006 renewal period in that the Endorsement did not decrease the Ditch Company's coverage. Accordingly, it is our opinion that, provided the Endorsement was originally sent, that the Notice of Violation/Cease and Desist/Clean-Up Order only describes situations which are within the policy exclusions and that no factual or legal basis exists in which United Fire might be held liable to indemnify the insured.

Thank you for the opportunity to review this matter. Should you have any questions regarding the foregoing, please do not hesitate to contact me.

Sincerely,

Debra P. DeRee    for

DPD/tls



Page 27 of 27



CRAIG W. CAIN
KRISTINE K. HAYTER*

# CAIN & HAYTER, LLP

### ATTORNEYS AT LAW

JEFFREY L. BODILY**
DEBRA P. DEREE
JENNIFER L. WHITE***
JOAN E. BURTZOS

OF COUNSEL:
CARLA M. ALBERS

COLORADO SPRINGS:
[MAIN OFFICE]
The Historic Alamo Building
128 South Tejon Street, Suite 100, Colorado Springs, Colorado 80903
Telephone 719-575-0010  Facsimile 719-575-0020

*Also admitted in Hawaii and Nebraska
**Also admitted in California
***Also admitted in Texas

DENVER:
3773 Cherry Creek North Drive, Suite 575, Denver, Colorado 80209
Telephone 303-331-6474  Facsimile 303-399-6480

WWW.CAINHAYTER.COM

---

If there is a problem with transmission or if all pages are not received, please call
(719) 575-0010 for retransmission.

---

**TO:** Bill Newman, Claims Supervisor          **FAX #:** (303) 650-4986

**COMPANY:** United Fire Group

**FROM:** Craig W. Cain, Esq.                    **DATE:** May 25, 2006

**RE:**     Claim No.:            1040501020753
            Insured:             New Salida Ditch, Inc.
            Date of Loss:        May 2005
            C&H No.:             800-06-3

Number of pages including this cover page:    _____28_____

MESSAGE: Please see the attached letter.

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original to us by mail without making a copy. Thank you.

UFC 2254

CRAIG W. CAIN

KRISTINE K. HAYTER*

# CAIN & HAYTER, LLP

### ATTORNEYS AT LAW

JEFFREY L. BO...

DEBRA P. DERE...

JENNIFER L. WHITE***

PATRICIA K. TRINOSKY LIND

JOAN E. BURTZOS

*Also admitted in Hawaii and Nebraska

**Also admitted in California

***Also admitted in Texas

OF COUNSEL:

CARLA M. ALBERS

COLORADO SPRINGS:

[MAIN OFFICE]

The Historic Alamo Building

128 South Tejon Street, Suite 100, Colorado Springs, Colorado 80903

Telephone 719-575-0010 Facsimile 719-575-0020

DENVER:

3773 Cherry Creek North Drive, Suite 575, Denver, Colorado 80209

Telephone 303-331-6474 Facsimile 303-399-6480

WWW.CAINHAYTER.COM

FROM THE OFFICE OF:

DEBRA P. DEREE

DDEREE@CAINHAYTER.COM

June 29, 2006

*Via Facsimile & U.S. Mail*
*(303) 650-4986*

Mr. Bill Newman, Litigation Supervisor
United Fire Group
P. O. Box 850
Westminster, CO 80030

RE:    **Claim No.:**    **1040501020753**
       **Insured:**    **New Salida Ditch, Inc.**
       **Date of Loss:**    **May 2005**
       **C&H No.:**    **800-06-3**

Dear Mr. Newman:

I am in receipt of your fax dated June 22, 2006, which included the following: May 26, 2006 e-mail from Neal Scharmer; June 8, 2006 letter to David Dodero; June 9, 2006 request for a copy of the total pollution exclusion endorsement; June 13, 2006 fax sending total pollution exclusion endorsement; June 20, 2006 letter from David Dodero; and sections from *Couch on Insurance*. Based upon a review of these documents and relevant case law, we would offer the following opinions regarding Attorney Dodero's position.

1.    **The TPE Endorsement precludes coverage for the claims alleged by Colorado Department of Public Health and Environment.**

In the first instance, the statement on page 4 of Attorney Dodero's response

EXHIBIT

Y

UFC 2180

Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

provides "[h]ere, United Fire admits that the TPE Endorsement was not part of the Policy it provided to Salida Ditch for the period at issue," is mistaken. This contention, by no means was not admitted. I would refer you to page 3 of your June 8, 2006 correspondence which states:

> **Every policy issued by United Fire to the Ditch Company, beginning on April 4, 1998, has contained a Total Pollution Exclusion Endorsement. More importantly, the Total Pollution Exclusion Endorsement applicable to the present action, CG 21 49 09 99, has been in effect and part of each of the Ditch Company's policies since April 4, 2000.**

As set forth, the total pollution exclusion endorsement has been a part of the Salida Ditch Company's policy since 1998.

In addition to the aforementioned, our position remains the same. C.R.S. § 10-4-110.5(1) provides, in pertinent part:

> **(1) No insurer shall increase the premium unilaterally or decrease the coverage benefits on renewal of a policy of insurance that provides coverages on commercial exposures such as general comprehensive liability, ... unless the insurer mails by first-class mail to the named insured, at the last address shown in the insurer's records, as least forty-five days in advance a notice, accompanied by the reasons therefor, stating the renewal terms and the amount of premium due....**

Based upon C.R.S. § 10-4-110.5, an insurer is not required to advise an insured when renewing the policy that there are no changes; rather, the insurer is charged only with notifying the insured of changes in the policy which affect the price or decrease coverage.

A copy of the total pollution exclusion endorsement was sent to the New Salida Ditch Company on February 9, 2000 (a copy of the endorsement was faxed to Attorney Dodero on June 13, 2006.) This also addresses another issue raised in Attorney Dodero's correspondence, i.e. whether United Fired sent the total pollution exclusion endorsement within the forty-five (45) days as set forth in C.R.S. § 10-4-110.5. The total pollution exclusion endorsement was sent on February 9, 2000, fifty-five (55) days prior to the renewal. (The total pollution exclusion endorsement has not changed since that time.) Accordingly, United Fire complied with all requirements as set forth in C.R.S. § 10-4-110.5.

Attorney Dodero's June 20, 2006 correspondence also makes reference to the expectations of the New Salida Ditch Company, citing to *Tepe v. Rocky Mountain Hospital and Medical Services*, 893 P.3d 1323 (Colo. App. 1994) for support of his position. We

UFC 2181

Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

would note that Colorado law holds that "the doctrine of reasonable expectations will be applied **only** if the contract is ambiguous." *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1028 (Colo. App. 2003); *Usick v. American Family Mut. Ins. Co.*, 131 P.3d 1195, 1201 (Colo. App. 2006). Moreover, "'[t]he doctrine of reasonable expectations supplements, but does not substitute for, the rule that insurance policies are to be considered according to well-settled principles of contract construction,' and insured has duty to read policy." *Dupre*, 62 P.3d at 1028.

In the present action and as set forth herein, it is our contention that the policy at issue is not ambiguous. As such, the doctrine of reasonable expectations, assuming even arguendo that the same would require coverage, is inapplicable to the present action.

> **B.** **The Total Pollution Exclusion Endorsement's definition of "pollutant" precludes coverage in this matter. There are no claims, of which we are aware, that would trigger coverage.**

Attorney Dodero argues that the definition of "pollutant" under the Clean Water Act does not include materials which were deposited by the New Salida Ditch Company upon the riverbank. Attorney Dodero also argues that dirt, rock, and soil are not pollutants as defined by the policy of insurance. For the reasons set forth herein, we disagree with Attorney Dodero's analysis.

We would first note that Attorney Dodero attempts to raise a new "issue" by calling the pollutants "sidecast fill." We have researched Colorado law to determine whether "sidecast fill" is a term of art. We have not been able to find any cases which define this term.

As to the second argument, based upon the case of *Globe Indemnity Co. v. Travelers Indemnity Company of Illinois*, 98 P.3d 971 (Colo. App. 2004), we respectfully disagree with Attorney Dodero's position that dirt, rock, and soil, do not constitute a pollutant under Colorado law. *Globe, supra* primarily addressed the issue of allocation on the risk of damages among various insurers. Accordingly, the policy did not address a pollution exclusion. Notwithstanding the same, *Globe, supra* is dispositive as to whether soil, rock and other geologic materials are considered a "pollutant."

In *Globe*, four insurers provided commercial general liability insurance to Arvada Excavating Company at various times between 1992 and 1998. *Id.* at 972. Between 1991 and 1993, Arvada performed excavation services for a housing development. *Id.* In 1998, a landslide occurred which caused property damage to homes within the housing development. *Id.* Various of the homeowners brought a claim against Arvada for failing to properly grade and compact the lots. Three (3) of the insurers, Northern, Globe and

UFC 2182



Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

Fidelity, settled with the homeowners, then brought a claim for declaratory judgment, contending that they were entitled to reimbursement for settlement costs, attorney fees and costs, from Travelers because their respective policies did not provide coverage for the loss alleged by the homeowners. *Id.* at 973.

The homeowners in *Globe* alleged in their Complaint that "[i]n or about March 1998, the culmination of a continuous and progressive geologic hazard process manifested itself in the form of a slope failure, landslide and/or land creep on Green Mountain, damaging and/or otherwise significantly impairing all of the plaintiffs' homes and underlying land." *Id.* at 974. In addressing the issue of allocation on the risk issues, the Colorado Court of Appeals held:

> **Here, pollutants were not introduced onto the land resulting in property damage that occurred over time.**

*Id.* at 974. Based upon the foregoing, the Colorado Court of Appeals has expressly held that geologic materials such as dirt, rock, and soil, materials comprising a land slide, constitute a "pollutant."

Attorney Dodero argues that the placement of the "sidecast material" on the riverbank does not constitute a "pollutant" pursuant to the Clean Water Act. Specifically, Attorney Dodero argues that the term pollutant, as defined by the Clean Water Act, requires that the pollutant be "discharged into water." However, based upon the foregoing Colorado Court of Appeals' decision in *Globe, supra,* it is clear that dirt, rock and soil are considered pollutants even when discharged onto the land. Accordingly, whether the "sidecast fill" was deposited into the river or along the riverbank, as in our case, is immaterial.

Attorney Dodero also attempts to create an issue in this matter by suggesting that there are multiple "claims" or "suits" and that a duty to defend is triggered by these multiple suits. For the reasons set forth herein, it is our opinion that Attorney Dodero's contention is without merit.

Only one (1) "suit" or "claim" has been filed: that is the claim by the CDPHE. Contrary to Attorney Dodero's contention, Dr. Sega has not initiated any suit in this matter. On February 9, 2006, counsel for Dr. Sega, Martin Holland, forwarded correspondence to Ms. Diana Humphreys of the US Army Corps of Engineers. Just to recap, the Ditch Company sought an after-the-fact permit from the US Army Corps of Engineers. As part of the permit process, the Colorado Department of Public Health and Environment (hereinafter "CDPHE") denied water quality certification for the project on February 14, 2006. The CDPHE, thereafter, issued a NOTICE OF VIOLATION/CEASE AND



UFC 2183



Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

DESIST/CLEAN-UP ORDER. Due to the pendency of the Notice of Violation from the CDPHE, the US. Army Corps of Engineers and the Ditch Company entered into a tolling agreement with respect to the Ditch Company's after-the-fact permit application.

Also part of the after-the-fact application process, the US Army Corps of Engineers sought public input relating to the Ditch Company's application. Attorney Holland responded to the US Army Corps of Engineers' request for public input. Specifically, Attorney Holland sent correspondence in which he states:

> **This Firm represents Dr. Ronald M. Sega with respect to the above described after-the-fact application for a permit concerning work along the Arkansas River near Salida Colorado. Dr. Sega is a landowner of a portion of the property where the work was performed without permit. He was not consulted before the work was performed and <u>I am presently investigating</u> whether a trespass occurred on the property by New Salida Ditch Company and also by the contractor that performed the work. It is my understanding that the trespass and damage on the property was actually inflicted by Lowry Land and Equipment Company. <u>The purpose of this letter is to respond during the public comments period of the permit application process.</u>**

Attorney Holland's correspondence clearly states that the purpose of the letter was in response to the public comments with respect to the application process. Moreover, Attorney Holland makes it clear that he is only investigating whether a trespass occurred. There is no indication that there is any "claim" or "suit" initiated by Dr. Sega in the February 9, 2006 correspondence.

Attorney Dodero also suggests that a "claim" or "suit" has been initiated by the Bureau of Land Management (hereinafter "BLM"). Again, we cannot find support for Attorney Dodero's position.

On February 10, 2006, the BLM, in response to the public comment request during the permit process, sent correspondence to Ms. Diana Humphreys of the US Army Corps of Engineers. The letter provides that the "BLM recommends that the ACOE require a professional, BLM-approved archaeologist to be present during any and all future ground-disturbing activities." The BLM also makes "Recommended Requirements to the Proposed Permit." Specifically:

> **Please note that the appropriate BLM staff will be available for further discussion of these comments, as appropriate restoration efforts are developed. We look forward to a rapid response, and recognize that**

UFC 2184



Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

further consultation will be necessary as NEPA commitments approach. BLM and ACOE will need close consultation in an effort to complete joint NEPA analysis and ensuing decisions, so that the ditch company receives the clear direction that they requested at the 1/19/06 meeting. <u>We feel strongly that the NEPA analysis must include the entirety of the area damaged by the project, and not just the portion below the ordinary high water line.</u>

As set forth, and contrary to Attorney Dodero's contention, the BLM has only made "recommendations" and has not initiated any "suit" or "claim" which would trigger an insurer's duty to investigate the claim.

Colorado has defined "pollutant" to include materials which would be a part of a landslide such as dirt, rock and soil. *Globe, supra.* Contrary to Attorney Dodero's contentions, there is only one (1) claim that we are aware of, that being the claim asserted by the CDPHE. With respect to the US Army Corps of Engineers, we would note that a tolling agreement is in place just to complete the application process, pending the resolution of the CDPHE claim. Based upon the foregoing, our position remains the same and the total pollution exclusion endorsement would preclude coverage based upon these facts.

As aforementioned, Attorney Dodero also attempts to argue that the "sidecast fill" does not fall within the policy's definition of "pollutant." Again, we disagree. The policy at issue defines "Pollutants" as:

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

The aforementioned exclusion is an "absolute" pollution exclusion clause. *Terramatrix, Inc. v. United States Fire Ins. Co.*, 939 P.2d 483 (Colo. App. 1997). Colorado has held whether an absolute pollution exclusion applies is based upon a determination of the "facts and circumstances presented in a particular case."

In the present case, the CDPHE has already determined that the material deposited by the New Salida Ditch Company constitutes a pollutant and that the Ditch Company deposited the materials in violation of the Clean Water Act. These facts, accompanied by the Colorado Court of Appeals' determination that materials from a landslide, i.e. dirt, rock and soil, constitute a pollutant lead us to the conclusion and opinion that the absolute pollution exclusion does apply to the facts and circumstances of this case.

Page 6 of 9





Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

Notwithstanding Attorney Dodero's contentions, the "sidecast fill" would classify as a contaminant. Attorney Dodero contends that the definition of "contaminant," as defined in *The American Heritage Dictionary*, 679 (Second College Edition 1985) is "something that contaminates." "Contaminate" is defined as "to make impure or corrupt by contact or mixture." *Id.*

We would note that multiple parties, including, but not limited to: (1) Collegiate Peaks Trout Unlimited; United States Environmental Protection Agency; (2) United States Department of the Interior Fish and Wildlife Service; and (3) the State of Colorado Division of Wildlife have all opined that soil, rock and dirt added to the Arkansas River has made the river impure. Specifically, these groups argue that the aquatic system was dramatically altered and corrupted by the Ditch Company's actions. More importantly, the CDPHE's NOTICE OF VIOLATION/CEASE AND DESIST/CLEAN-UP ORDER provides that the actions undertaken by the Ditch Company included "disturbance" and that the "Project pose[s] imminent and substantial endangerment to the beneficial uses of the Arkansas River." We feel the contentions of these groups support our position. Based upon the clear language of the NOTICE OF VIOLATION/CEASE AND DESIST/CLEAN-UP ORDER, it is our opinion that the fill material deposited by the Ditch Company would qualify as a contaminant and/or irritant.



Because Attorney Dodero argues that the definition of "pollutant," either in the policy or under the Clean Water Act, does not include "sidecast fill," I have looked into the definition of "sidecast fill." According to Attorney Dodero, he has concluded that "sidecast fill" must not be a pollutant. The Ministry of Forests defines "sidecast" as "moving excavated material onto the downslope side of a temporary access structure, excavated or bladed trail, or landing during its construction." The Ministry of Forests also defines "fill" as "material used to raise the desired road profile above the natural ground line." In the present action, the CDPHE has identified the fill material at issue as "soil and rock." Accordingly, the "sidecast fill" at issue in this matter is the soil and rock placed along the riverbank of the Arkansas River and directly into the Arkansas River. Accordingly, it is our opinion that "sidecast fill" in this case would qualify as a pollutant.

We would note that jurisdictions which have not adopted an absolute pollution exclusion have, nonetheless, held that the absolute pollution exclusion does apply to environmental pollutants. *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 30 (1st Cir. 1999); *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1183 (6th Cir. 1999). In the present action, the sidecast fill is clearly environmental.

Attorney Dodero relies upon the case of *West Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.*, 503 N.W.2d 596 (Iowa 1993) to support his contention that the total pollution exclusion endorsement does not defeat coverage. Attorney Dodero's reliance is misplaced



Page 7 of 9





Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

for two (2) reasons. First, the Iowa case has no precedential value in Colorado. Arguably, it may be persuasive but it is not dispositive. The second, and more important distinction is that *West Bend* does not even address a total pollution exclusion. The pollution exclusion in *West Bend* was a traditional pollution exclusion not a total pollution exclusion. Accordingly, *West Bend* is inapplicable to the present action.

Attorney Dodero makes two (2) additional arguments: (1) the total pollution exclusion endorsement would effectively preclude any possible claim; and (2) that the deposit of fill material by the Ditch Company, was an "accident." For the reasons set forth herein, Attorney Dodero's positions are without merit.

As to this first argument, Colorado has adopted the position that all of the facts and circumstances of a claim will be subject to analysis to determine whether the claim falls within the total pollution exclusion. *See, Terramatrix, supra.* As such, if a third party is injured by a rock and files a claim, as Attorney Dodero suggests, all of the facts and circumstances surrounding the instance would be analyzed to determine whether the total pollution exclusion applies.



As to the second argument, Attorney Dodero claims that the New Salida Ditch Company's "accidental" discharge of rock and soil onto the banks of the Arkansas River does not constitute a pollutant is without merit. It is our understanding that the New Salida Ditch Company's discharge of rock and soil was not accidental; rather, it was intentional. Notwithstanding the same, the total pollution exclusion endorsement does not make any distinction between accidental and intentional discharge of pollutants. Consequently, Attorney Dodero's attempt to characterize the discharge as "accidental" is immaterial to the coverage analysis.

In conclusion, our opinion remains the same. Colorado has approved the total pollution exclusion endorsement. An analysis of that endorsement is based upon the facts and circumstances of the particular case. In the present action, the New Salida Ditch Company deposited rock and soil into and alongside the banks of the Arkansas River. Under the definition of pollutant in the policy, Colorado law, and the Clean Water Act, soil and rock are considered pollutants. Accordingly, it is our opinion that the total pollution exclusion endorsement would apply.

Page 8 of 9



UFC 2187



Mr. Bill Newman, Litigation Supervisor
Claim No.: 1040501020753
June 29, 2006

    Should you have any questions regarding the foregoing, please do not hesitate to
contact me.

                             Sincerely,

                             Debra P. DeRee

Page 9 of 9



**UFC 2188**

# CAIN & HAYTER, LLP

CRAIG W. CAIN

KRISTINE K. HAYTER*

**ATTORNEYS AT LAW**

OF COUNSEL:
CARLA M. ALBERS

JEFFREY L. BODILY**

DEBRA P. DEREE

JENNIFER L. WHITE***

JOAN E. BURTZOS

*Also admitted in Hawaii and Nebraska

**Also admitted in California

***Also admitted in Texas

<u>COLORADO SPRINGS:</u>
[MAIN OFFICE]
The Historic Alamo Building
128 South Tejon Street, Suite 100, Colorado Springs, Colorado 80903
Telephone 719-575-0010  Facsimile 719-575-0020

<u>DENVER:</u>
3773 Cherry Creek North Drive, Suite 575, Denver, Colorado 80209
Telephone 303-331-6474  Facsimile 303-399-6480

WWW.CAINHAYTER.COM

FROM THE OFFICE OF:

DEBRA P. DEREE
DDEREE@CAINHAYTER.COM

August 18, 2006

### <u>Via E-Mail</u>

Mr. Bill Newman, Litigation Supervisor
United Fire Group
P. O. Box 850
Westminster, CO 80030

RE:     **Claim No.:        1040501020753**
        **Insured:           New Salida Ditch, Inc.**
        **Date of Loss:      May 2005**
        **C&H No.:           800-06-3**

Dear Mr. Newman:

We are in receipt of your e-mail dated August 11, 2006 with the attached correspondence from Attorney Dodero dated August 10, 2006. After review of the same, we would offer the following:

   1.    **Attorney Dodero's contention that there are "claims" or "suits" raised on behalf of the Bureau of Land Management (hereinafter "BLM") and/or the Army Corps of Engine(hereinafter "COE") is unsupported. Assuming that either the BLM or the COE has alleged a claim, the Total Pollution Exclusion still applies to preclude coverage.**

In the first instance, we would note that the New Salida Ditch Company (hereinafter "Ditch Company") did not perceive the correspondence from the BLM dated July 19, 2005

EXHIBIT

Z

tabbies®

UFC 2122



Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

nor the correspondence from the COE dated May 13, 2005 and June 15, 2005 as a claim or suit. I would draw your attention to the policy. The policy provides:

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

...

2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit
    a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:
        (1) How, when and where the "occurrence" or offense took place;
        (2) The names and addresses of any injured persons and witnesses; and
        (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.
    b.    If a claim is made or "suit " is brought against any insured, you must:
        (1) Immediately record the specifics of the claim or "suit" and the date received; and
        (2) Notify us as soon as practicable.
        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.
    c.    You and any other insured must:
        (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
        (2) Authorize us to obtain records and other information;
        (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and
        (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.
    d.    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid,

Page 2 of 11

UFC 2123



Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

**without our consent.**

The policy language required the Ditch Company to immediately notify United Fire of any claim or "suit". We would note that the letters that Attorney Dodero contends constitute a claim or a "suit" were sent on May 13, 2005, June 15, 2005 and July 19, 2005. The log notes in our possession indicate that the first notice from the Ditch Company was on March 13, 2006, nearly nine (9) months later.

We would also note that Attorney Dodero, or at least the Ditch Company, agreed with United Fire's position regarding a claim or suit. The claim was filed by the CDPHE on March 6, 2006. Attorney Dodero sent a letter to United Fire seeking a defense to the claim on March 13, 2006. The date the file was opened at United Fire was the day that Attorney Dodero advised United Fire of the claim. Clearly, this fact indicates that the Ditch Company agreed with United Fire's position regarding whether the letters of May 13, 2005, June 15, 2005 and July 19, 2005 constituted a claim or "suit". More importantly, the Ditch Company impliedly acknowledges that there was no occurrence, claim or "suit" implicated simply by applying for an after-the-fact permit from the COE.

Notwithstanding the aforementioned, the Colorado Supreme Court has adopted a notice/prejudice rule in *Clementi v. National Mut. Fire. Ins. Co.*, 16 P.3d 223 (Colo. 2001). Essentially, under *Clementi*, an insurer must show prejudice by an insured's failure to provide timely notice. In the present action, an argument could be advanced that United Fire was prejudiced by the nine (9) month delay in providing notice in that United Fire was potentially unable to pursue a declaratory judgment action in a timely manner. Unfortunately, we do not believe that this argument is likely to be very persuasive. However, as set forth, the compelling issue is that the Ditch Company only notified United Fire after the administrative action was commenced by the CDPHE on March 6, 2006.

Assuming for the sake of argument that the COE's letters of May 15, 2005 and June 15, 2005 were asserting a claim, the allegations contained in the COE correspondence relate to the very same issues raised by the CDPHE, i.e. the Ditch Company's deposit of fill material into and along the banks of the Arkansas River. Accordingly, even assuming for the sake of argument that the COE alleged a claim or "suit" by these letters, the Total Pollution Exclusion would apply to those claims also.

Supporting the position United Fire has taken, we would note that recently, on July 27, 2006, the California Court of Appeals addressed nearly an identical issue with respect to the applicability of a total pollution exclusion endorsement as the one presently at issue in *Ortega Rock Quarry v. Golden Eagle Ins. Corp.*, 46 Cal. Rptr. 3d 517 (Ca. App. 2006). In *Ortega*, appellant, Ortega Rock quarry operated a rock quarry in southern Orange County. *Id.* at 520. Golden Eagle Insurance Company issued a general



Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

commercial liability policy to Ortega with policy dates of February 1999 to February 2000 (hereinafter "GEIC").   Ortega had also purchased a commercial liability policy from Continental Casualty Company (hereinafter "CNA") with policy dates of February 1998 to February 1999.   Both policies contained a Total Pollution Exclusion Endorsement, substantially identical to the one at issue.[1]   *Id.*   The Environmental Protection Agency (hereinafter "EPA") issued an "administrative order" to Ortega alleging that Ortega violated certain provisions of the EPA by discharge of "fill material" into the Lucas Canyon Creek. *Id.* Specifically, the E.P.A. order provided:

> **(1) Immediately cease discharge of fill material into Lucas Canyon Creek expect as authorized by permit;**
> **(2) Submit an interim erosion control pan and site restoration plan;**
> **(3) Submit an interim erosion control plan to curtail erosion of the fill materials into the creek; and**
> **(4) Submit a restoration plan detailing the manner in which the impacted areas of the creek would be restored.[2]**

*Id.* The E.P.A. order went on to provide that Ortega violated section 1311(a) of title 33 of the United States Code "which makes it unlawful to discharge any pollutant from a point source into any water of the United States without a permit. " *Id.* The E.P.A. further alleged that the fill material consisted of rocks and dirt. *Id.*

Ortega cooperated in the development of a removal and restoration plan.   The E.P.A. ordered Ortega to complete the plan by December 15, 2000. *Id.*

---

[1]  The entire Total Pollution Exclusion Endorsement under either the GEIC or the CNA policy was not fully set forth in *Ortega, supra.* Notwithstanding the same, a majority of the exclusion was set forth and those portions were identical to the endorsement at issue.

[2]  We would note that the COE letter of March 2, 2006 ordered the Ditch Company to:
> a. Remove all fills placed below the ordinary high water mark of the Arkansas river back to the original bankline.
> b. Stabilize exposed riverbank slopes with erosion control blankets.
> c. Construct a berm along the top of the bank to prevent stormwater runoff down the bank.

The remedial actions set out by the COE in the present action are nearly identical to those set out by the E.P.A. in *Ortega, supra.*

UFC 2125



Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

In June of 2001, the Santa Margarita Company, Ortega's lessor, filed a civil action against Ortega alleging damage to the creek and surrounding property. *Id.* Ortega submitted both the EPA administrative proceeding and civil claim to GEIC and CNA for defense and indemnification. *Id.* at 521. GEIC and CNA declined both claims contending that the Total Pollution Exclusion precluded coverage because rocks and dirt were considered pollutants. *Id.* Ortega than filed a claim for breach of insurance contract and breach of the covenant of good faith and fair dealing. GEIC and CNA both filed motions for summary judgment, which the trial granted. *Id.* Specifically, the Trial Court held that the policies did not trigger a duty to defend finding that the pollution exclusions excluded coverage for Ortega's claims . *Id.* Ortega appealed contending that the pollution exclusions were ambiguous and as such, the same should be construed against the insurer. *Id.*

Before the California Court undertook an analysis regarding the pollution exclusion, the Court undertook an analysis of whether the E.P.A. Order constituted a "suit" under the policy. *Id.* at 520. (Frankly, we do not see any indication that this matter was being appealed or was even briefed.) We would note that both policies defined a "suit" nearly identical to the policy at issue. Specifically, the policies defined "suit" as:



> **A civil proceeding in which damages because of ...'property damage,' ... to which this insurance applies are alleged."**

The California Appeals Court held that the Order from the E.P.A. did not constitute a "suit" under the policy because the proceeding was administrative. *Id.* at 524.

Arguably, we would note that the California Court's interpretation of the E.P.A. Order would be contradictory to Colorado law as set forth in *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606 (Colo. 1999) as to such administrative action constituting a "suit". As you may recall, in *Compass*, the Cities entered into an agreement regarding the construction and operation of a wastewater treatment facility, the Bi-City Wastewater Treatment Facility. *Id.* at 610. The Bi-City Wastewater Treatment Facility disposed of its sewer sludge at the Lowry Landfill. *Id.* at 611. In 1985, the EPA sent a notice to Englewood that is was one of many Potentially Responsible Parties (PRPs) , for costs and clean up associated with the Lowry Landfill due to the disposal, treatment, or transportation of hazardous substances at the Lowry Landfill. *Id.* Among other issues raised, the insurers challenged whether the PRP letters constituted a "suit" under the policy which would trigger the insurer's duty to defend. Specifically, the insurers contended that "the policies do not provide coverage for administrative actions...." *Id.* at 622.

The Colorado Supreme Court disagreed. The Court, relying upon the holding in

Page 5 of 11





Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

*Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 445 Mich. 558, 519 N.W.2d 864 (1994), held that "the term 'suit' as used in the insurance policies at issue encompassed not only traditional lawsuits filed in court but also coercive administrative actions such as those initiated by PRP letters under CERCLA." *Id.* We point out this fact because we anticipate Attorney Dodero will focus on this distinction and attempt to argue that *Ortega, supra* is inapplicable based upon this distinction. Again, we would note that there is nothing in the case to suggest that this was an issue that was before the Court on appeal. Accordingly, *Ortega, supra* will be found distinguishable on this one (1) point. Nevertheless, we will argue that the analysis, with respect to the total pollution exclusion endorsement, is persuasive and particularly applicable to the present action.

As set forth, *Ortega, supra* is very persuasive with respect to the issue of whether the total pollution exclusion is ambiguous and whether the definition of pollutants would encompass fill material such as dirt and rock. Ortega argued that dirt and rock could not constitute a pollutant because rock and dirt naturally occur in nature and that they were not contaminants when they were dumped into the river. *Id.* at 524. In rejecting Ortega's contention, the Court looked to the definition of pollutant under the Clean Water Act (which was the definition cited by the E.P.A. in the administrative order and in the present action) which includes: "dredged, spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." Additionally, the California Court of Appeals held that "state and federal environmental laws may provide insight into the scope of the policies' definition of pollutants without being specifically incorporated in those definitions." *Id.* at 525.



> **"[H]azardous substances are not rendered non-polluting by the fact that they are naturally occurring [citation], since, in this case, the hazardous material 'is not found in its unaltered form because mining, an unnatural process, has altered its location.'"**

*Id.* citing *Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.* (295 A.D.2d 289, 290 (N.Y. 2002).
Accordingly, the *Ortega* Court held that the definition of "pollutant" under the policy included dirt and rocks.

Ortega also argued that the pollution exclusion was ambiguous because the use of the term "including" preceding a list of examples of pollutants, did not include rock or dirt and therefore, only "contaminants" and "irritants" specifically enumerated after "including"





Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

i.e. "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste"[3] were excluded from coverage. *Id.* In rejecting Ortega's contention, the Court held that "including is ordinarily a term of enlargement rather than limitation." *Id.* a t 526. As such, the terms "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste" were included but not exclusive. *Id.* Accordingly, the Court held that GEIC and CNA did not have a duty to defend or indemnify Ortega based upon the total pollution exclusion.

Based upon the foregoing, there is a persuasive argument that the fill material deposited by the Ditch Company would constitute a pollutant under the policy. The fact that dirt and rock are naturally occurring is irrelevant. It is the "unnatural" act of the Ditch Company's deposit of the rock and dirt in a place in an altered location which makes such a pollutant.

As aforementioned, Attorney Dodero contends that the COE letters of May 15, 2005, June 15, 2005 and March 2, 2006 and the BLM letter of July 19, 2005 constitute a "suit" under the policy. Assuming for the sake of argument only, that they do, the policy of insurance still contains a Total Pollution Exclusion Endorsement. This endorsement would preclude coverage based upon our prior analysis as well as the recent California Court of Appeals analysis in *Ortega, supra.*

One issue remains with respect to the BLM correspondence of July 19, 2005 and February 10, 2006. Those letters suggests that the Ditch Company may have trespassed upon BLM land. The July 19, 2005 correspondence from the BLM, specifically provides:

> **This is a notice of suspected unauthorized use of Federal land administered by the bureau of Land Management....**
> **If the allegations we have made are correct, you have 30 days from receipt of this notice to appear at the BLM office at the address shown above to effect a settlement for trespass damages.**

We have no information to suggests that the Ditch Company ever contacted the BLM to discuss the July 19, 2005 correspondence. We would note that the February 10, 2006 correspondence from the BLM to the COE suggests that the Ditch Company took no action

---

[3] Pollutants under the GEIC and CNA policies is defined "pollutant" as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemical and waste. Waste included materials to be recycled, reconditioned or reclaimed." This is the exact definition of "pollutant" in the policy at issue.

UFC 2128



Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

in response to the July 19, 2005 correspondence. More importantly, both the July 19, 2005 and February 10, 2006 correspondence indicate that there is a "suspected" trespass. This fact is clearly defined in the BLM's correspondence of February 10, 2006. Specifically, that correspondence provides:

### Current Realty Situation

**Revised Statute 2339 does not define the dimensions (width) of land that a ditch could occupy. However, agency policy and decisions rendered by IBLA cases have resulted in the interpretation that the area occupied (disturbed) by construction and maintenance prior to The Federal Land Policy and Management Act of 1976 (FLPMA), enacted on October 21, 1976, is the right-of-way boundary (original footprint.) The Federal land would have to be unappropriated, however, and this area was appropriated in 1909 by the withdrawal. Therefore, a width that varies over the length of the ditch, depending on the footprint created by construction and maintenance activities, could have been located and surveyed or mapped for this ditch in 1909. The FLPMA did not require any existing right-of-way holder under RS 2339 to file any application or maps. At various times, the BLM has attempted to encourage holders to do so, after which the BLM would file the documents and record the existence of the right-of-way on Master title Plats (MTP). <u>BLM had contacted the ditch company requesting them to provide any documents to help define the right-of-way. To date no document has been provided.</u> Maintenance of the ditch is authorized within the RS 2339 right-of-way, whereas, reroutes, reconstruction, widening of the footprint, lengthening, etc. would require prior authorization by the BLM under the authority of the FLPMA, TITLE V - RIGHTS-OF-WAY. <u>Therefore, to the extent that the disturbance is outside the "original footprint" (1909) on BLM administered Federal land (not on private land or railroad right-of-way), the provisions of RS 2339 do not apply and an authorization under FLPMA was required. The BLM considers the work done by the ditch company to far exceed simply "maintenance".</u>**

### Recommended Realty Requirements

Page 8 of 11



UFC 2129

Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

> ***The ditch company should apply for a right-of-way from the BLM,
> including payment of the appropriate fees, in order to avoid
> official trespass action and financial penalties.***

(Underline emphasis added.)  Based upon the language of the BLM letter of February 10,
2006, the BLM is not even conclusively certain that a trespass had occurred.  The exact
"original footprint" from 1909 is currently unknown.  Although it is clear from the
February 10, 2006 correspondence that the BLM suspects that the Ditch Company
exceeded the footprint, again, there does not appear to be any conclusive evidence of the
same.  As such, the BLM recommends to the COE that the Ditch Company be required to
obtain a right-of-way permit from the **BLM to avoid official trespass action and financial
penalties.**  It is our opinion that the operative word is "avoid".  Based upon this language,
it is our opinion that the BLM has not initiated a trespass action against the Ditch Company.
In fact, it is our opinion that the BLM correspondence of February 10, 2006 clearly states
that the Ditch Company, can "avoid" a trespass claim by obtaining a right-of-way permit.
Accordingly, our position remains unchanged and that the BLM has not alleged a claim or
suit based in trespass against the Ditch Company.  In fact, the BLM is not even certain
that a trespass has occurred.

In addition to the foregoing, we would note that coverage may still be excluded
based upon other exclusions contained in the policy.  Specifically,

    2.      Exclusions

    This insurance doe not apply to:

    j.      Damage to Property

            "Property damage" to:

            (1)     Property you own, rent, or occupy, including
                    any costs or expenses incurred by you, or
                    any other person, organization or entity, for
                    repair, replacement, enhancement,
                    restoration or maintenance of such property
                    for any reason, including prevention of injury
                    to a person or damage to another's property;

                    ...

Page 9 of 11



Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

(5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

...

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.
Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k.    Damage To Your Product
"Property damage" to "your product" arising out of it or any part of it.

l.    Damage To Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work out of which the damage arises was performed on your behalf by a subcontractor.

In conclusion, our opinion remains the same. Colorado has approved the total pollution exclusion endorsement. Further, recently, the California Court of Appeals in *Ortega*, *supra* has endorsed the definition of "pollutant" to include rock and dirt. Accordingly, it is our opinion that the total pollution exclusion endorsement would apply to this claim by new Salida Ditch Company.

Likewise, our position remains unchanged that the COE has not alleged a claim or "suit" against the Ditch Company. However, even assuming that the COE has alleged a claim, those claims would be subject to the total pollution exclusion endorsement which

Page 10 of 11






Mr. Bill Newman, Litigation Supervisor
RE: Claim No.: 1040501020753
August 18, 2006

would preclude coverage.

Finally, with respect to the BLM claims, again, assuming for the sake of argument that the BLM has alleged a claim or suit, the February 10, 2006 correspondence indicates that there is no conclusive evidence that a trespass had occurred. In fact, the BLM correspondence suggests that the Ditch Company "avoid" litigation by obtaining a right-of-way permit. Accordingly, our position remains that the July 15, 2006 correspondence from the BLM to the Ditch Company and the February 10, 2006 correspondence to the COE do not constitute a claim or "suit" under the policy.

Should you have any questions regarding the foregoing, please do not hesitate to contact me.

Sincerely,

Debra P. DeRee

Page 11 of 11

ite: 6/22/2006   Time: 2:17 PM   To: CAIN & HAYTER LLP @ 17195750020                    Page: 007
    Message                                                              Page 1 of 1

### Newman, Bill

**From:** Scharmer, Neal

**Sent:** Friday, May 26, 2006 12:40 PM

**To:** Newman, Bill; Sheronick, Bedora

**Subject:** RE: Claim 1040501020753; New Salida Ditch, Inc.

Bill,
I have reviewed the coverage opinion and discussed with Bedora. I agree with the conclusion of outside counsel on the duty to defend.

I also believe that the allegation that the Total Pollution Exclusion was not "received" by the insured to be something could be refuted by the policy compilation people here at UFC. I think this is quite automated and we could defend the policy, but since there was no reduction in coverage and in fact we were using a form that had been on multiple prior renewals of the policy I believe it is a non-issue.

**From:** Newman, Bill
**Sent:** Friday, May 26, 2006 11:54 AM
**To:** Scharmer, Neal; Sheronick, Bedora
**Subject:** Claim 1040501020753; New Salida Ditch, Inc.

Neal and Bedora:

You reviewed this claim before we declined defense in the pollution proceeding. The insured's attorney sent a letter in which he stated why he thought that our position was incorrect and asked us to reconsider. We assigned to independent coverage counsel to review and advise us whether we have a duty to defend.

The insured's attorney's letter and coverage counsel's report are attached for your review. Debra DeRee with Cain & Hayter agrees with us that we have no duty to defend. I have reviewed the report and agree.

Because the insured's attorney is aware that Cain & Hayter are coverage counsel for us on this claim, I have asked Debra DeRee to draft an appropriate letter to send over her signature, and to send it to me to review before it is mailed.

Please advise whether you agree that we have no duty to defend. I will not authorize mailing the letter before I hear from you.

Bill Newman

**EXHIBIT**
tabbies

AA

UFC 2197

# GRUND, DAGNER & NELSON, P.C.

Attorneys at Law

303 East Seventeenth Avenue, Suite 303
Denver, Colorado 80203-1256
(303) 830-7770  Facsimile (303) 830-2313
www.gdnlaw.net

JOHN W. GRUND
(Also licensed in
Wyoming)

Direct Dial
(303) 830-7774
jwgrund@gdnlaw.net

January 26, 2009

**VIA FACSIMILE**

Adam B. Kehrli, Esq.
The Hustead Law Firm PC
4643 S. Ulster Street, Suite 1250
Denver, CO 80237-4307

    Re:   *New Salida Ditch Co. v. United Fire & Casualty Co.*
           United States District Court, Civil Action No. 08-cv-00391-JLK-KMT
           Our File No.:  800715

Dear Mr. Kehrli:

    This letter responds to your request that I review the materials that your office sent me and provide you with my opinions regarding the dispute that is currently pending in federal court between the New Salida Ditch Company and your client, United Fire & Casualty Company ("United Fire"). The genesis for this suit is a disagreement over insurance coverage that arose as a result of plaintiff's actions in May 2005, which led to an enforcement action by the Colorado Department of Public Health and Environment ("CDPHE") in 2006. Plaintiff sought coverage under the policy for its defense in that enforcement action, and United Fire declined to provide that defense, following a number of rounds of correspondence between plaintiff's then counsel and United Fire representatives.

## INTRODUCTION

    My opinions in this case are based on the materials that I have studied as well as on my personal background. Regarding the former, you have supplied me with several thousand pages of documentation that I have reviewed, in addition to the Amended Complaint filed by plaintiff, and United Fire's Answer. Attached is a table of contents to the notebooks I have that contain those materials, which identifies what I have considered.

    My opinions are also informed by my more than 30 years of experience as an attorney whose practice has focused significantly on work with and for insurance companies. That is, in the majority of cases that I have handled over the years, I have been retained by insurance companies or by others, either to represent the interests of the companies' insureds, to represent



EXHIBIT
BB

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
January 26, 2009
Page 2

the insurers' interests, or to review and assess the compliance of insurance companies with statutory and industry standards and practices. For many years, I published and/or contributed to a monthly newsletter that emphasized, *inter alia*, numerous issues related to the insurance industry. In 2000, West Group published the second edition of a multi-volume work that I co-authored and supplement annually, and that addresses, in part, insurance law in Colorado. Also, since early in my career, I have counseled insurance companies regarding various aspects of insurance operations, including appropriate claims-handling procedures, based on the then-existing law and accepted industry standards. I have also served previously as an expert witness in both federal and state court actions concerning issues of insurance coverage and industry standards, as well as in professional negligence actions against attorneys, and in legal fee disputes. My curriculum vitae is enclosed, providing more details regarding my background.

### DISCUSSION

The facts in this case do not appear to be much disputed; instead, it is the policy interpretation, based on those facts, about which the parties disagree. Also, while the many thousands of pages that both sides have disclosed reflect the considerable effort that the parties have expended in addressing the issues raised, the focus of the parties' dispute is fairly narrow. I suppose what surprises me the most is not plaintiff's sincere interest in having its position on coverage control, but that – given the facts and the law – plaintiff would allege that United Fire has acted in bad faith in maintaining its coverage position. The Court will ultimately have to decide which coverage position prevails, but I find no basis for plaintiff's assertion that United Fire has acted tortiously in its response to the claim.

Turning to the facts, because they seem generally acknowledged by both sides, and because what I assume is my restricted file contains so much rehashing of them, I will try to keep my summary brief.

Plaintiff has been in existence for more than 100 years and provides water for its member owners near the Arkansas River in south central Colorado. From time to time, plaintiff has made repairs to its irrigation ditch to protect and maintain its water. In the Spring 2005, plaintiff undertook what it characterized as "maintenance" as a result of a breach in the ditch. In the course of that work, soil and rocks – also referred to as "fill material" – were added to the bank of the Arkansas River, at least some of it below the river's high-water line. Complaints were made by various parties – both governmental and private – and the following year, on March 6, 2006, CDPHE issued a Notice of Violation/Cease and Desist/Clean-Up Order, requiring plaintiff to remediate the damage that the state agency claimed it caused. The Order noted that plaintiff had undertaken its work without an appropriate permit from the department's Water Control Division, which resulted, so the State alleged, in statutory violations of the law. In short order, plaintiff was told that it had to retain certain professionals and submit a plan and permit

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
January 26, 2009
Page 3

application to undo the damage that it had done. Without agreeing that it had violated the law, plaintiff undertook to respond to the State's Order.

The State's Order had followed quite a bit of correspondence between plaintiff's personal counsel and federal agencies, which had charged plaintiff with violating the federal Clean Water Act. From what I saw, it appeared as if the wrangling between the federal agencies and plaintiff was moving toward an amicable resolution, when the State issued its Order. These federal agencies (the Army Corps of Engineers and the Bureau of Land Management) were generally seeking the same type of remediation, but appeared to have a greater willingness to try to work things out without any formal order or action, at least until the state agency denied the necessary water quality certification for plaintiff's planned project in response to the federally-raised concerns. In any event, and however one characterizes the communications from the various agencies (and some of those communications are attached as exhibits to plaintiff's Amended Complaint), there is no question that by the Spring of 2006, plaintiff had to answer to the State because of its Order. In addition to the concerns raised by governmental agencies, those processes invited public comment, and a number of individuals and entities with private interests also voiced concerns about the claimed damage that the plaintiff did to the Arkansas River, with at least one neighboring landowner, Dr. Ron Sega, being particularly "vocal" in his complaints, raised primarily through his personal counsel.

Plaintiff attempted to address the concerns raised by these public and private entities and individuals and also, on March 7, 2006, submitted a notice of a claim to United Fire, indicating that the date of the claim was May 12, 2005. After that, United Fire representatives began an intensive review of materials that were submitted and the CGL policy that had been issued to plaintiff, in order to respond to the claim. On March 16, 2006, Mr. Ron Reihmann sent plaintiff a reservation-of-rights letter, raising various limitations on any potential coverage. Less than two weeks later, Bill Newman, a United Fire Litigation Supervisor, wrote plaintiff's counsel, Mr. David M. Scanga, advising him of United Fire's formal coverage position at that time, which was a declination of coverage based on the then-existing facts. See UFC 0346f. Thereafter, a correspondence exchange took place between Mr. Newman for United Fire and Mr. Scanga, then later, another attorney in his firm, Mr. David M. Dodero, for plaintiff, regarding the coverage dispute. This exchange – which remained polite, with each side insistent on its own position – continued into the Fall, when Mr. Dodero communicated plaintiff's final demand that United Fire defend plaintiff, on October 3, 2006. See UFC 0813f. There was one last effort by plaintiff's current counsel in the pending lawsuit, William J. Brady, on February 26, 2008, when he wrote Mr. Newman and also enclosed a copy of the initial Complaint that was filed. See UFC 0003f.

For its part, UFC did not reach its conclusions only through its own employees. On May 4, 2006, Mr. Newman wrote to the law firm of Cain & Hayter, enclosing United Fire's file

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
January 26, 2009
Page 4

materials and requesting a formal coverage opinion. See UFC 0961. That opinion, by Cain & Hayter attorney Ms. Debra P. DuRee, was sent on May 25, 2006. Ms. DuRee's ultimate conclusion echoed that reached earlier by Mr. Newman, as I will discuss below. See UFC 2227f. I indicated earlier that the parties' disagreement is fairly focused, and the letters exchanged between the two sides' representatives reflect that. Generally speaking, and without trying to be too abbreviated in addressing the more central issues, in evaluating whether United Fire had a duty to defend plaintiff with respect to the CDPHE order, first Mr. Newman, and then Ms. DuRee, agreed that

- the State Order qualified as a "suit" for purposes of triggering United Fire's defense obligation of an otherwise covered claim;

- the matters alleged by the State constituted an "occurrence" under the CGL policy;

- the State's allegation of what resulted from plaintiff's actions constituted "property damage," again triggering coverage of an otherwise qualified claim;

- while a number of the exclusions noted in Mr. Reihmann's reservation-of-rights letter and discussed by Mr. Newman and Ms. DuRee *might* not be covered for indemnity purposes at the end of the day, their application was questionable as it concerned the duty-to-defend obligation;

- however, given the allegations in CDPHE's March 6, 2006 Order, the policy's Total Pollution Exclusion did apply to preclude coverage and any duty to defend.

There are a couple of other disputed issues, but the applicability of the Total Pollution Exclusion is the crux of the parties' opposing positions regarding coverage, as is reflected in plaintiff's Amended Complaint. That pleading contains three claims for relief against United Fire. The first is for breach of contract, an issue that the Court will have to decide as a legal matter; the second claim is for insurance bad faith,[1] and the Third Claim for Relief purports to allege claims under the Colorado Unfair Claims-Deceptive Practices Act ("UCDPA"), §§ 10-3-1101, *et seq.*, C.R.S., and the Colorado Consumer Protection Act ("CCPA"), §§ 6-1-101, *et seq.*, C.R.S. This third claim makes little sense to me as a separate claim. First, as it concerns the UCDPA, it is simply improper, because the Colorado courts have long held that that Act does not create any private right of action. *See, e.g., American Family Mut. Ins. Co. v. Allen*, 102 P.3d

---

[1] As part of the claim for bad faith, plaintiff inappropriately asserts allegations under §§ 10-3-1115 and -1116, C.R.S. See Amended Complaint at ¶¶ 26-27. Not only is such a claim improper from a timing standpoint – given the effective date of the enactment of House Bill 08-1407 – the new statutory provisions apply only to first-party claims, and plaintiff's is clearly a third-party claim. *See* § 10-3-1115(1)(b)(2), and *compare* § 10-3-1113(2) *with* § 10-3-1113(3), C.R.S.

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
January 26, 2009
Page 5

433 (Colo. 2004); *Cary v. United of Omaha Life Ins. Co.*, 43 P.3d 655 (Colo.App. 2001), *rev'd on other grounds*, 68 P.3d 462 (Colo. 2003). Regarding the CCPA aspect of the Third Claim for Relief, plaintiff has completely failed to allege the elements of such a claim, and based on the allegations in the Amended Complaint, it seems highly unlikely plaintiff could do so in good faith. *See Bankruptcy Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519 (Colo.App. 2008).

Because this case is in federal court, there is simultaneous disclosure of expert opinions, and thus, I am limited to reading the Amended Complaint, and to a more limited extent the file materials, to try to understand the underlying bases for plaintiff's bad-faith claim.[2]  The Amended Complaint itself refers to several different "claims" advanced against plaintiff as a result of the underlying conduct, and then takes issue with United Fire's reliance on the Total Pollution Exclusion. Essentially, the sole basis for the disagreement is plaintiff's position that the term "pollutant," as defined in plaintiff's policies with United Fire, does not include the type of "fill material" that is the subject of what plaintiff refers to as "the Underlying Proceedings and the Sega Claim." See Amended Complaint at ¶¶ 14-15. Plaintiff then states in a conclusory fashion that "United Fire's persistent and unreasonable conduct in refusing and continuing to refuse to provide a defense . . . is in bad faith breach of its CGL policy insurance contract [sic] and duty of good faith and fair dealing." Id. at ¶ 24.

The issue of whether there is essentially one *claim* advanced against plaintiff or two or more claims was the subject of the ongoing correspondence between United Fire and plaintiff's personal counsel. I agree with United Fire's position that there is only the State claim to evaluate for coverage purposes and, in any event, would take strong issue with anyone contending that United Fire's position is an unreasonable one. Plaintiff attached to the Amended Complaint the February 9, 2006 letter from Dr. Sega's counsel, but it is odd that they would suggest that that is advances any type of "claim." The letter itself states that Dr. Sega's counsel is "presently investigating whether a trespass occurred on his property by [plaintiff]"; suggests his understanding that any actual trespass "was actually inflicted" by another party; and then expressly states that his purpose in writing was "to respond during the public comments period of the permit application process." Amended Complaint, Exhibit G at 1. Further, a number of United Fire's letters clearly indicated that if and when Dr. Sega did pursue a formal claim against plaintiff, United Fire would address any duty-to-defend obligation as it concerned such a claim. Also, the damages sought by plaintiff's Amended Complaint relate to legal fees and expenses incurred in responding to the CDPHE Order, and not to any hypothetical claim by Dr. Sega.

Concerning the core issue, and as I noted at the outset, I share United Fire's analysis of the CDPHE Order and its conclusion that the Order implicates the Total Pollution Exclusion.

---

[2]  In his February 26, 2008 letter, Mr. Brady did identify Mr. Garth Allen as someone with whom he has consulted with regard to the bad-faith claim, but nowhere in that letter or elsewhere that I saw did Mr. Brady expand in any way on any opinions that Mr. Allen, or any other consultant, might have expressed to him.

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
January 26, 2009
Page 6

Further, and more importantly as it concerns plaintiff's Second Claim for Relief, I truly cannot understand how anyone could claim that United Fire's interpretation is unreasonable and contrary to insurance industry standards.

As has been noted repeatedly throughout the parties' letters, the CDPHE Order noted as one of its findings of fact that plaintiff's conduct "disturbed soil and rock ('fill material') directly in and along" a lengthy portion of the Arkansas River, and that that "disturbed land . . . remains unstabilized with no pollution controls in place to prevent erosion of the disturbed slopes or further discharges of soil and sediment to the Arkansas River." See id., Exhibit F at 2, ¶ 7. The Order goes on to expressly state that "[s]oil and rock are 'pollutants' as defined by § 25-8-103(15)[, C.R.S.,] and its implementing permit regulation, 5 CCR 1002-61, § 61.2(76)." Id. at ¶ 9. The referred-to statute states as follows:

> "Pollutant" means dredged spoil, dirt, slurry, solid waste, incinerator residue, sewage, sewage sludge, garbage, trash, chemical waste, biological nutrient, biological nutrient, biological material, radioactive material, heat, wrecked or discarded equipment, rock, sand, or any industrial, municipal, or agricultural waste.

§ 25-8-103(15).

Because it is familiar to everybody, I will not recite the Total Pollution Exclusion here, but the policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

I am at a loss to understand how plaintiff can argue that where the "suit" at issue explicitly alleges that the insured engaged in acts constituting pollution, then expressly refers to a specific definition of pollution in a statute that also qualifies under the policy definition of "pollutant," this somehow avoids implication of the Total Pollution Exclusion. The Amended Complaint does nothing but state in conclusory terms that United Fire's policy definition does not include "fill material," which is simply a synonym employed by the State in its Order for "soil and rock," which the Order identifies expressly as "pollutants." Other arguments plaintiff raised and seemingly abandoned, properly, were its claim that United Fire failed to provide plaintiff with the exclusion and that the "reasonable expectations" doctrine somehow applies, see letter from Mr. Dodero to Mr. Newman, dated June 20, 2006, UFC 0645f, neither of which has any merit under the circumstances of this case, as Mr. Newman addressed in his July 28, 2006 letter. UFC 0735f. Because one must focus on the four corners of the "complaint" in issue – here, the CDPHE Order – United Fire's position is not only entirely consistent, given the State's

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
January 26, 2009
Page 7

language and the policy's exclusion and "pollutant" definition, it is entirely in keeping with insurance industry standards, which govern the reasonableness of an insurer's conduct. In my opinion, it was perfectly appropriate for United Fire to deny coverage for the claim presented to it, and it would have ignored and would not have fulfilled its obligation to its other policy- and shareholders if it had agreed to defend the claim made by the State. United Fire's file materials reflect that it gave weighty and due consideration to all the various aspects of plaintiff's tender for coverage; that its ultimate conclusion, later reinforced by its retention of outside counsel and that counsel's independent coverage opinion, was a correct and proper one; and even more importantly (considering my role in this litigation), that United Fire's handling of this claim from its inception through its various exchanges with plaintiff's counsel demonstrates United Fire's *good* faith, both in its initial analysis, as well as in its exchanges with plaintiff's counsel, in considering the other side's views and properly evaluating them.

I am unsure that I can say more at this time, especially since we do not have any report from plaintiff's consultant to review and consider. If and when you do receive any additional materials or reports that you would like me to consider, I would be happy to accommodate you and to provide you with any additional thoughts that I might have. Also, if there are issues that I have not addressed to your satisfaction, please feel free to contact me so that I can attend to that.

I do not at this time anticipate offering any exhibits for use at trial, but I may well refer to some of the documentation that you supplied me for illustrative purposes or to support what I have discussed above. In addition to a copy of my current curriculum vitae, I enclose a list of those cases in which I have testified at deposition, trial, arbitration, or hearing over the last four years (the letter next to the date designates the forum). My hourly rate for work on this matter is $300.

Very truly yours,

GRUND, DAGNER & NELSON, P.C.

John W. Grund

JWG/nde
Enclosures

# GRUND, DAGNER & NELSON, P.C.
### Attorneys at Law

303 East Seventeenth Avenue, Suite 303
Denver, Colorado 80203-1256
(303) 830-7770  Facsimile (303) 830-2313
www.gdnlaw.net

JOHN W. GRUND
(Also licensed in
Wyoming)

Direct Dial
(303) 830-7774
jwgrund@gdnlaw.net

March 2, 2009

**VIA FACSIMILE**

Adam B. Kehrli, Esq.
The Hustead Law Firm PC
4643 S. Ulster Street, Suite 1250
Denver, CO 80237-4307

    Re:   *New Salida Ditch Co. v. United Fire & Casualty Co.*
          United States District Court, Civil Action No. 08-cv-00391-JLK-KMT
          Our File No.:  80071$

Dear Mr. Kehrli:

    This letter responds to your request that I review the January 26, 2009 report submitted by plaintiff's consultant, Mr. Garth H. Allen, and provide you with my thoughts about that report. Mr. Allen's report is divided into various sections, the first several of which generally address coverage. After that, he reviews some law concerning bad faith and charges United Fire with that tort; goes so far as to suggest that § 10-3-1115, C.R.S., applies to this set of facts; and concludes with sections on the Unfair Claim Settlement Practices Act, what he calls the "equitable consideration doctrine," and, finally, the Colorado Consumer Protection Act (CCPA). While I am somewhat bewildered by a number of the positions that Mr. Allen advocates for plaintiff, it is also notable that he completely omits any discussion regarding the thoroughness of United Fire's evaluation of this case and, especially, the fact that United Fire sought and received an extensive evaluation by outside counsel, whose recommendation it followed. I fully understand that an insurer's reliance on the advice of counsel does not immunize its coverage determination, but I am nonetheless surprised that Mr. Allen did not even acknowledge those efforts by United Fire and its outside counsel. What is most disconcerting about the Allen report, however – and especially having read many of his reports in other cases – is how he distorts the matrix of law and insurance industry practices by attempting to apply principles (and in some cases, statutes) in a manner that makes no sense, given the underlying circumstances of this case.

    First, Mr. Allen attempts to conflate communications from federal agencies and Dr. Sega with the CDPHE Order, to suggest that United Fire should somehow have considered all of these in evaluating the duty to defend. The stretch in his reasoning is rather obvious when one recognizes that he does acknowledge that the only document that mandated any response by New


EXHIBIT
CC

# GRUND, DAGNER & NELSON, P.C.

Adam B. Kohrli, Esq.
March 2, 2009
Page 2

Salida (thus, qualifying as a "suit," and which was the only claim that New Salida was formally required to defend) was that received by New Salida from the CDPHE, the "Notice of Violation/Cease and Desist Order/Clean-up Order." No other formal "claim" was ever filed against New Salida and, more importantly, New Salida did not have to respond formally to anything but that Notice/Order. To suggest that United Fire should have been considering any duty-to-defend obligation in response to communications from other agencies or individuals is to ignore the facts of the case, as well as the activity undertaken by New Salida and for which it sought reimbursement. Accordingly, I disagree strongly with any notion that United Fire "improperly limited its evaluation to the allegations in the CDPHE clean-up order. . . ." Allen report at 2. As I said, that order was the only "suit," that would or could have triggered any duty to defend.

Mr. Allen then criticizes United Fire for following what he calls the "eight corners rule" (Id. at 4), when that is and has been the law in Colorado for a considerable period of time.[1] To suggest, as Mr. Allen does, that United Fire acted inappropriately in failing to consider all of the evidence as one would at the indemnity stage – because New Salida sought coverage for both defense and indemnity – in evaluating whether to defend the CDPHE order, is a complete misstatement of Colorado law and insurance industry practices. It is no wonder that, in that portion of his report, Mr. Allen cites no applicable legal authority. As he is well aware, there is none to support his notion.

At the heart of Mr. Allen's position is his belief that, in this case, United Fire misinterpreted its own policy exclusion and the definition of "pollutant" and that United Fire should have recognized the definition was ambiguous. What he fails to do here, and it is surprising, because it is not an omission he makes in other reports, is to focus on the "complaint" that the insurer was required to consider in determining whether coverage existed and whether any exclusion applied to preclude coverage. I agree that dirt, rocks, and soil would not necessarily be a pollutant in every instance, under the definition in the United Fire policy. If a particular solid were not claimed to be a contaminant or the conduct in question were not alleged to be a polluting incident, it would not fit the policy's definition of "pollutant." That is not the situation here, however, and Mr. Allen's refusal to acknowledge how the definition in the policy is implicated by and fits the underlying allegations in the Notice/Order is what makes his analysis faulty. The essence of the "complaint" that United Fire was asked to defend is the State's charge that the damage in question – which United Fire acknowledged constituted "property damage," for purposes of analyzing its defense obligation – was caused by New Salida's conduct in polluting the Arkansas River with "fill material," consisting of soil and rock. The very "suit" that plaintiff asked United Fire to defend is one alleging that New Salida's

---

[1] What Mr. Allen calls the "eight corners rule," is simply an acknowledgement that one looks at the four corners of a complaint and then considers that within the terms of the available coverage under the policy, a second document, from which he takes his four additional "corners."

# GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
March 2, 2009
Page 3

conduct constituted pollution, utilizing a definition that is consonant with the policy definition. Mr. Allen's attempt to ignore what this case is about and to try to make it into something it is not is unavailing, for these reasons and for those stated in my initial report. There simply is no ambiguity in the instant case, given the policy definition and specific allegations against the insured.

Implicit in the foregoing comments is any response I would make to Mr. Allen's attempt to support the claim of bad faith. United Fire's thorough analysis of the case and the nature of the allegations in the Notice/Order against plaintiff readily reflect the reasonableness of United Fire's conduct. Further, and as I noted previously, Mr. Allen's inexplicable failure even to acknowledge United Fire's having this matter referred to independent counsel for that counsel's extensive analysis is yet another factor that undermines his conclusion about bad faith. Not only did United Fire evaluate this claim at high levels within its own claim department, it did something that not all insurers do in having the matter re-evaluated by, and then reasonably relying upon, the report of Ms. DuRee at the firm of Cain & Hayter.

Turning to the portion in Mr. Allen's report where he discusses the recent enactment of §§ 10-3-1115 & -1116, concerning the improper denial of claims, I am at a complete loss to understand why someone with his knowledge and experience of insurance law would even bother trying to support such a meritless claim. He correctly notes that the new statutory provision refers to "improper denial of . . . first[-]party claims, then tries to suggest that the definition of first-party claims – because it "include[s] a claim by the insured for 'benefits owed directly to or on behalf of an insured under an insurance policy,'" Allen report at 7 – can be implicated in a case like this. It is ironic that Mr. Allen would accuse United Fire of misrepresentation, later in his report, when it is he who should look in the mirror. First, when it suited a point that he wanted to make, he readily acknowledged that the claims in this case for bad faith are solely those involving third-party coverage. Id. at 6. In fact, he even quoted from § 10-3-1113(2), which states that "[u]nder a policy of liability insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer's delay or denial was negligent." That is a correct statement of the law in the situation involving third-party claims and liability coverages. In the very next section of his report, however, he refers to one part of § 10-3-1115, but fails to mention that the *very next portion* of the subsection he quotes states as follows: "'First-party claimant'" does *not* include: . . .(B) [a] person asserting a claim against an insured under a liability policy." § 10-3-1115(1)(b)(II). Further, the remedies available under the new provisions do not include any remedy that would apply in a liability case of this sort. Mr. Allen refers to the remedies available in § 10-3-1116(1), but fails to note that the recovery of "reasonable attorney fees and court costs and two times the covered benefit," is allowable where a claim for payment of benefits has been unreasonably delayed or denied, and that involves only first-party claims. § 10-3-1116(1).

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
March 2, 2009
Page 4

Perhaps what is most distressing about Mr. Allen's attempt to align this statute with an inapplicable case is his failure to note that the statute does not even apply to claims arising before August 2008, so even if the underlying claim were a first-party claim for benefits, the statute can have no application to it given when this action accrued.

To me, the only portion of these new provisions that does apply is § 10-3-1116(5), which mandates that a court should award costs and attorney fees to the defendant where an action is brought that is frivolous. Any time or costs expended in responding to plaintiff's and Mr. Allen's arguments under §§ 10-3-1115 & -1116 has been spent in response to a clearly frivolous claim.

Concerning Mr. Allen's comments about the Unfair Claim Settlement Practices Act, § 10-3-1104(h), I see little to be gained in addressing each of them specifically. I do not feel that a predicate has been shown to implicate any of the provisions under that statute, for the various reasons I have outlined above and in my earlier report as to why United Fire's conduct has been reasonable in responding to plaintiff's requests for a defense. Mr. Allen claims that United Fire "misrepresented coverages," he says, by "misinterpreting exclusions," Allen report at 7, which is a wholly novel approach to the use of the word "misrepresented." He even branches into areas concerning standards of investigation that, as the language of his report reflects, he is simply theorizing about. An expert should, as much as possible, try to rely on what he knows or claims to know, and not guess about what may or may not be. Ultimately, his notions about the Unfair Claims Settlement Practices Act simply echo his earlier analysis regarding coverage – while I fully acknowledge that the parties have a disagreement about coverage, there is nothing unreasonable about United Fire's interpretation of its policy and handling of this claim.

The "equal consideration doctrine," set out as it is in Mr. Allen's report without any legal reference is something that he says United Fire must apply, but he cites no authority to support it. He claims this "doctrine" "is widely recognized by insurers," but he cites to nothing in any statute, regulation, or case to suggest his "doctrine" has been recognized in Colorado. To the extent he meant to refer to the quasi-fiduciary relationship that exists between an insurer and an insured in the third-party context, *see Brodeur v. American Home Assur. Co.*, 169 P.3d 139 (Colo. 2007), I acknowledge that there is such a relationship in a case of this sort, but fail to see anything in the underlying facts to suggest that United Fire's handling of this claim did not reflect its acknowledgement of the duties that it owed to New Salida. In Mr. Allen's report, he talks about warnings that United Fire should have given to plaintiff and refers to matters that have nothing to do with the underlying claim in this case, and are in no way supported by the underlying record. It is quite difficult to try to respond to some type of claim that lacks support in either the law or the facts.

## GRUND, DAGNER & NELSON, P.C.

Adam B. Kehrli, Esq.
March 2, 2009
Page 5

Finally, as it concerns the CCPA, I noted in my earlier report that the elements of such a claim are nowhere even alleged in plaintiff's Amended Complaint, an oversight that apparently does not concern Mr. Allen, whose mode of reasoning in trying to support a CCPA claim defies logic. I do understand that, in appropriate circumstances, an insured *may* state such a claim against an insurer; as I noted in my first report, however, there is nothing about the facts of this case or even the bare allegations advanced by plaintiff that come close to what is necessary to establish a CCPA claim. I found nothing about Mr. Allen's comments regarding the Act to lend support to such a claim here.

Having read all of Mr. Allen's comments and re-reviewed my own report, I have not found anything that alters my earlier-expressed opinions. If anything, the extent to which it seems clear Mr. Allen has had to "reach" to try to support plaintiff's claims against United Fire only reinforce my belief that United Fire acted fully consistent with insurance industry standards in declining to extend a duty defend plaintiff against the CPHDE's Order, given the facts of this case.

If there is anything in Mr. Allen's report that I have not addressed to your satisfaction, I urge you to contact me so that I can do so. And, as I noted in my earlier report, if there are additional documents or materials that you would like me to consider that are disclosed later in this case, please send them to me and I would be happy to review them.

Very truly yours,

GRUND, DAGNER & NELSON, P.C.

John W. Grund

JWG/ldh